# EXHIBIT 1

Justin A. Savage (*pro hac vice* forthcoming)
Daniel J. Feith (*pro hac vice* forthcoming)
jsavage@sidley.com
dfeith@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

Maureen Gorsen (SBN 170158)
Brooklyn Hildebrandt (SBN 350707)
mgorsen@sidley.com
bhildebrandt@sidley.com
SIDLEY AUSTIN LLP
350 S. Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

*Attorneys for American Fuel & Petrochemical Manufacturers, National Association of Convenience Stores, and Energy Marketers of America*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA and UNITED STATES DEPARTMENT OF TRANSPORTATION,<br><br>          Plaintiffs,<br><br>     v.<br><br>CALIFORNIA AIR RESOURCES BOARD and STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board,<br><br>          Defendants. | Case No. 2:26-cv-00847-DJC-SCR<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE BY AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, NATIONAL ASSOCIATION OF CONVENIENCE STORES, AND ENERGY MARKETERS OF AMERICA**<br><br>Assigned to Hon. Daniel J. Calabretta<br><br>Trial Date:          Not set<br>Action Filed:   March 12, 2026 |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

I.      INTRODUCTION ....................................................................................................... 1

II.     Background ................................................................................................................. 2

        A.      Plaintiff Intervenors Include Trade Associations Whose Members Are
                Directly Harmed by the Challenged Regulations. ......................................... 2

        B.      The Challenged CARB Regulations. ............................................................. 3

        C.      The Litigation Is in the Early Stages. ........................................................... 7

III.    Argument .................................................................................................................... 7

        A.      Plaintiff Intervenors Have Standing to Sue in Support of Plaintiffs. ............ 8

        B.      Plaintiff Intervenors Are Entitled to Intervene as of Right. ......................... 9

                1.      Plaintiff Intervenors Are Key Stakeholders with Significantly
                        Protectable Interests. ....................................................................... 10

                2.      The Disposition of This Action Would Impair Plaintiff Intervenors'
                        Interests. .......................................................................................... 11

                3.      This Motion Is Timely. .................................................................... 12

                4.      The Existing Parties Do Not Adequately Represent Plaintiff
                        Intervenors' Interests. ...................................................................... 13

        C.      Alternatively, Plaintiff Intervenors Satisfy the Standard for Permissive
                Intervention. ................................................................................................. 15

IV.     CONCLUSION......................................................................................................... 17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Canatella v. Cal.*,
    404 F.3d 1106 (9th Cir. 2005) ...............................................................................11

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*,
    647 F.3d 893 (9th Cir. 2011) ............................................................................10, 13

*Collins v. Yellen*,
    594 U.S. 220 (2021)..................................................................................................8

*Diamond Alt. Energy, LLC v. EPA*,
    606 U.S. 100 (2025)..................................................................................3, 5, 8, 10

*Diamond v. Charles*,
    476 U.S. 54 (1986)..................................................................................................10

*Delta Constr. Co. v. EPA*
    783 F.3d 1291 (D.C. Cir. 2015) ...............................................................................4

*Freedom from Religion Found., Inc. v. Geithner*,
    644 F.3d 836 (9th Cir. 2011) ..................................................................................15

*Fund for Animals, Inc. v. Norton*,
    322 F.3d 728 (D.C. Cir. 2003)................................................................................14

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)...............................................................................................7, 8

*Kelly v. Ironshore Indem., Inc.*,
    2023 WL 12022685 (C.D. Cal. Sept. 15, 2023) .......................................................9

*Smith v. L.A. Unified Sch. Dist.*,
    830 F.3d 843 (9th Cir. 2016) ..................................................................................12

*Sw. Ctr. for Biological Diversity v. Berg*
    268 F.3d 810 (9th Cir. 2001) .........................................................................8, 10, 11, 13, 14

*State v. Dir., U.S. Fish & Wildlife Serv.*,
    262 F.3d 13 (1st Cir. 2001)......................................................................................14

*U.S. v. City of L.A.*,
    288 F.3d 391 (9th Cir. 2002) ...............................................................................9, 10

*W. Watersheds Project v. Haaland*,
    22 F.4th 828 (9th Cir. 2022) ...................................................................................12

ii

*Wilderness Soc'y v. U.S. Forest Serv.*,
630 F.3d 1173 (9th Cir. 2011) ............................................................9, 10

**Statutes**

5 U.S.C. § 801(b)(2).............................................................................5

49 U.S.C. § 32901.................................................................................1

49 U.S.C. § 32904(c) .............................................................................3

49 U.S.C. § 32919(a) .............................................................................1

13 Cal. Code Regs. § 1961.3................................................................1, 6

13 Cal. Code Regs. § 1963.3.1.................................................................1

13 Cal. Code Regs. § 1962.2..............................................................1, 5, 6

13 Cal. Code Regs. § 1962.2.1............................................................1, 6

**Other Authorities**

38 Fed. Reg. 10,868 (May 2, 1973) ..........................................................3

75 Fed. Reg. 25,324 (May 7, 2010) ..........................................................3

84 Fed. Reg. 51,310 (Sept. 27, 2019) ........................................................4

85 Fed. Reg. 28,564 (May 13, 2020) .........................................................3

90 Fed. Reg. 24,507 (June 11, 2025) .........................................................7

Fed. R. Civ. P. 24(a)............................................................................9

Fed. R. Civ. P. 24(b) ..........................................................................15

CARB, 5-Day Public Notice and Comment Period: Emergency Vehicle Emissions
Rulemaking Public Notice (Sept. 15, 2025) ............................................5

CARB, Advanced Clean Cars Summary (2019), *available at*
https://ww2.arb.ca.gov/sites/default/files/2019-12/acc%20summary-final_ac.
pdf ............................................................................................4

CARB, Staff Report: Initial Statement of Reasons for Proposed Rulemaking, at
Table III-A-4-12 (Dec. 7, 2011) ...........................................................4

CARB, Press Release 12-05 (Jan. 27, 2012), *available at*
https://ww2.arb.ca.gov/news/california-air-resources-board-approves-advanced-
clean-car-rules.............................................................................4

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

Report: Initial Statement of Reasons for Proposed Rulemaking (Dec. 7, 2011) .........4

iv

## I.    INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 24, American Fuel & Petrochemical Manufacturers ("AFPM"), Energy Marketers of America ("EMA"), and National Association of Convenience Stores ("NACS") (collectively the "Proposed Plaintiff Intervenors" or "Plaintiff Intervenors") respectfully move to intervene in this action in support of Plaintiffs United States and Department of Transportation ("DOT"), which are challenging the carbon dioxide ($CO_2$) emission standards and zero-emission vehicle ("ZEV") mandate enacted by Defendant California Air Resources Board ("CARB") and implemented by Defendant Steven S. Cliff. As explained below, Plaintiff Intervenors satisfy the requirements for intervention as of right under Federal Rule of Civil Procedure 24(a) and therefore seek to intervene as of right. Alternatively, Plaintiff Intervenors move for permissive intervention under Rule 24(b).

The Energy Policy and Conservation Act ("EPCA") requires uniform, nationwide vehicle fuel-economy standards. *See* 49 U.S.C. § 32901 *et seq*. Congress expressly preempted state laws and regulations that are "related to fuel economy standards" for vehicles already covered by such federal standards, including light-duty vehicles. 49 U.S.C. § 32919(a). Despite this unequivocal Congressional mandate, Defendants have adopted and enforced state regulations that function as fuel economy standards for light-duty vehicles. These regulations include increasingly stringent $CO_2$ standards for light-duty vehicles from 2017 onward, requiring progressively lower tailpipe $CO_2$ emissions each model year, with compliance demonstrated at both the test group and fleet-wide levels. 13 Cal. Code Regs. §§ 1961.3, 1963.3.1. These regulations also include a ZEV mandate that imposes a partial ban on internal combustion engines ("ICE") by setting a market share quota in favor of electric vehicles. 13 Cal. Code Regs. §§ 1962.2, 1962.2.1. These regulations "relate to" fuel economy under EPCA because limiting tailpipe $CO_2$ emissions and requiring the replacement of

1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

light-duty ICE vehicles with ZEVs increases fleetwide fuel economy. Accordingly, these regulations are preempted by EPCA, 49 U.S.C. § 32919(a).

AFPM is the leading association of entities that produce and sell gasoline, diesel, and other liquid fuels ultimately consumed by vehicles subject to and affected by the challenged regulations. NACS is the leading global trade association dedicated to advancing the convenience and fuel retailing industry. And EMA is a federation of 48 state and regional trade associations representing family-owned and operated small business energy marketers across the United States. The challenged fuel economy standards affect Plaintiff Intervenors' members because they are designed to decrease demand for the very liquid fuels members produce, supply, market, or sell. Intervention is warranted because Plaintiff Intervenors and their members have a substantial interest in maintaining consumer demand for their products.

## II.    BACKGROUND

### A.    Plaintiff Intervenors Include Trade Associations Whose Members Are Directly Harmed by the Challenged Regulations.

Together, Plaintiff Intervenors represent various lengths of the fuel supply chain—from manufacturing to retail sales. Upstream, AFPM is a national trade association representing most of the United States' petroleum refining capacity. *See* Ex. A, Decl. of Susan W. Grissom ("Grissom Decl.") ¶ 2. AFPM members produce the fuels that power the U.S. economy and the chemical building blocks integral to millions of products that make modern life possible—specifically, automobiles such as light-duty vehicles, which are subject to fuel economy standards. *Id.* Downstream, NACS is the leading global trade association dedicated to advancing convenience and fuel retailing, serving as a trusted advisor to its retailer and supplier members. *See* Ex. B, Decl. of Varish Goyal ("Goyal Decl.") ¶ 1; Ex. C, Decl. of Erin Graziosi ("Graziosi Decl.") ¶¶ 1– 2. And EMA is a national trade association representing thousands of motor fuels wholesalers, made up of 48 State and regional trade associations representing petroleum marketers nationwide.

2

*See* Ex. D, Decl. of James H. Lipscomb, III ("Lipscomb Decl.") ¶¶ 2–3. Together, NACS and EMA members market, sell, and supply liquid fuels for those same automobiles, including those light-duty vehicles subject to fuel economy standards. Goyal Decl. ¶ 3; Graziosi Decl. ¶ 4; Lipscomb Decl. ¶¶ 1, 9. Regulation of fuel economy affects Plaintiff Intervenors' members by impacting demand for their products. *See Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025) (recognizing that regulation of vehicle greenhouse-gas emissions "likely cause[s] fuel producers' monetary injuries because the regulations likely cause a decrease in purchases of gasoline and other liquid fuels for automobiles"); 75 Fed. Reg. 25,324, 25,327 (May 7, 2010) (recognizing that greenhouse-gas emissions and fuel economy standards are two sides of the same coin); Grissom Decl. ¶¶ 12–15 (explaining the direct impact of fuel economy standards on demand for liquid fuels produced by AFPM members); Graziosi Decl. ¶¶ 6–9 (same for NACS); Lipscomb Decl. ¶¶ 6–11 (same for EMA).

### B.    The Challenged CARB Regulations.

The regulation or prohibition of vehicle tailpipe $CO_2$ emissions directly affects fuel economy because fuel economy is measured by $CO_2$ emissions, among other factors. *See* 49 U.S.C. § 32904(c); 38 Fed. Reg. 10,868 (May 2, 1973); 85 Fed. Reg. 28,564, 28,567 (May 13, 2020). Because $CO_2$ emissions are "essentially constant per gallon combusted of a given type of fuel," 75 Fed. Reg. 25,324, 25,327 (May 7, 2010), regulations that *reduce* tailpipe $CO_2$ emissions from ICE vehicles generally require technologies to *reduce* fuel consumption, thereby *increasing* fuel economy. The greater an individual vehicle's fuel economy, the fewer grams of $CO_2$ it will emit per mile, and vice versa. Thus, rules that limit or prohibit $CO_2$ emissions relate to—and are, indeed, directly tied to—fuel economy. ZEV mandates operate similarly. Requiring a certain portion of vehicles in a manufacturer's fleet to have *no* tailpipe $CO_2$ emissions improves the manufacturer's fleetwide fuel economy. A regulation requiring a fleetwide fuel economy average

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

achievable only by deploying a certain number of ZEVs—i.e., zero $CO_2$ emissions to reduce the fleetwide average fuel economy—operates in the same manner. These ZEV requirements take no account of consumer demand but nonetheless directly and substantially impact corporate average fuel economy, in the same manner as regulations explicitly eliminating $CO_2$ emissions. 84 Fed. Reg. 51,310, 51,320 (Sep. 27, 2019). In short, "any rule that limits tailpipe greenhouse gas emissions is effectively identical to a rule that limits fuel consumption." *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015) (cleaned up).

CARB understands this relationship well. In 2012, CARB adopted regulations collectively known as Advanced Clean Cars I ("ACC I") to, among other things, "provide cars that save consumers thousands of dollars at the pump" by controlling greenhouse gas emissions, such as $CO_2$, for model years 2017 through 2025 and beyond, and by mandating the production and sale of ZEVs.[1] Since its inception, CARB has touted the fuel savings benefits[2] of its ACC I regulations to consumers of liquid fuels—i.e., Plaintiff Intervenors' customers—initially projecting average savings of $6,000 over the life of a single light-duty vehicle.[3] CARB intended not only to reduce emissions but also to fundamentally alter the fuels market in California, stating the "emissions benefit" of its ACC I regulations was "due mostly to increased electricity and hydrogen use, and the resulting decrease in the production and use of gasoline."[4] CARB's direct understanding was that the various iterations of its ACC I rules would "substantially reduce combustion, distribution,

---

[1] CARB, Press Release 12-05 (Jan. 27, 2012), *available at* https://ww2.arb.ca.gov/news/california-air-resources-board-approves-advanced-clean-car-rules. As discussed *infra*, CARB has recently taken the position that ACC I remains enforceable, a position with which Plaintiff Intervenors disagree.
[2] CARB, Staff Report: Initial Statement of Reasons for Proposed Rulemaking, at Table III-A-4-12 (Dec. 7, 2011) ("2011 CARB Staff Report") (summarizing lifetime consumer fuel savings for sample technology versus 2008 baseline technology).
[3] *Id.* (at $3.50 gallon, as an example, this could equate to approximately 1,714 gallons of gasoline per vehicle on the road in California).
[4] CARB, Advanced Clean Cars Summary (2019), *available at* https://ww2.arb.ca.gov/sites/default/files/2019-12/acc%20summary-final_ac.pdf.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

refining and extraction of gasoline" and that the vehicles complying with ACC I would "lower[] demand for the petroleum refining and gasoline distribution sectors."[5]

Most impactful to AFPM's members is CARB's current enforcement of ACC I requirements that limit fleetwide tailpipe $CO_2$ emissions and mandate ZEVs. Under ACC I, CARB requires compliance with $CO_2$ standards for light-duty vehicles from 2017 onward. For example, the $CO_2$ exhaust standard for model year 2017 was 195.0 grams/mile compared with 131.0 grams/mile for model year 2025, a significant reduction in tailpipe emissions and thus fuel consumption. ACC I also requires automakers to ensure that a certain percentage of the cars and light trucks that each automaker delivers for sale in California (an automaker's vehicle fleet) for model years 2017 to 2025 are composed of electric vehicles—i.e., vehicles with zero tailpipe emissions. *See Diamond Alt. Energy*, 606 U.S. at 104–05. For 2025, the ZEV mandate imposed a 22-percent ZEV credit requirement. 13 Cal. Code Regs. § 1962.2. In 2022, CARB adopted Advanced Clean Cars II ("ACC II"), increasing the stringency of the ZEV mandate for light-duty vehicles. Although EPA granted a preemption waiver under section 209(b) of the Clean Air Act for ACC II in December 2024, Congress enacted a joint resolution under the Congressional Review Act in June 2025 disapproving of the ACC II waiver. H.J. Res. 88 (119th Congress). EPA cannot grant another preemption waiver that is "in substantially the same form." 5 U.S.C. § 801(b)(2).

Despite this, CARB adopted an "emergency" rulemaking to reinstate earlier-adopted state standards that it asserts are subject to operative waivers. See CARB Emergency Vehicle

---

[5] 2011 CARB Staff Report at 205, 199.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

Emissions Rulemaking Public Notice, Dkt. 73-33 at 6–7 ("Emergency Rule").[67] CARB claims that its emergency rulemaking "clarif[ies] the law to confirm that, at a minimum, CARB's earlier-adopted standards, which have extant federal preemption waivers not subject to the recent congressional resolutions, are operative." *Id.* at 2–3.[89] Such standards that purportedly have a waiver include those in ACC I. 13 Cal. Code Regs. §§ 1962.2, 1962.2.1. Through the Emergency Rule, CARB also reinstated the stringent $CO_2$ standards codified at 13 Cal. Code Regs. § 1961.3 (from ACC I) in an attempt to apply indefinitely the stringent MY 2025 $CO_2$ standards for light-duty vehicles. As it stands, CARB is enforcing fleetwide $CO_2$ standards related to fuel economy for the very light-duty vehicles that Plaintiffs' members fuel. Moreover, CARB extended its ZEV mandates to require Defendant Cliff to "certify new 2018 and subsequent model year passenger cars, light-duty trucks, and medium-duty vehicles as ZEVs, vehicles that produce zero exhaust emissions of any criteria pollutant (or precursor pollutant) or greenhouse gas, excluding emissions from air conditioning systems, under any possible operational modes or conditions." 13 Cal. Code Regs. §§ 1962.2, 1962.2.1.

CARB has committed to enforcing its $CO_2$ standards and ZEV mandate under ACC I. *See, e.g.*, CARB, Manufacturers Advisory Correspondence MAC-ECCD-2025-08 (Aug. 25, 2025) (requiring manufacturers wishing to sell new vehicles in California to certify compliance with

---

[6] CARB, 5-Day Public Notice and Comment Period: Emergency Vehicle Emissions Rulemaking Public Notice (Sept. 15, 2025), *available at* https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2025/emergencyvehemissions/notice.pdf.
[7] CARB, Notice of Approval of Emergency Regulatory Action, OAL No. 2026-0316-04EE (Mar. 26, 2026), *available at* https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2025/emergencyvehemissions/approvedread optregtext.pdf.
[8] CARB, 5-Day Public Notice and Comment Period: Emergency Vehicle Emissions Rulemaking Public Notice (Sept. 15, 2025), *available at* https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2025/emergencyvehemissions/notice.pdf.
[9] CARB, Notice of Approval of Emergency Regulatory Action, OAL No. 2026-0316-04EE (Mar. 26, 2026), *available at* https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2025/emergencyvehemissions/approvedread optregtext.pdf.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

ACC I regulations or EPA vehicle emission standards "currently codified"—emission standards that have since been repealed). Like the $CO_2$ standards, the ZEV mandates from ACC I and the Emergency Rule require that for 2018 and subsequent model years, a portion of each manufacturer's fleet have zero tailpipe $CO_2$ emissions. 13 Cal. Code Regs. §§ 1962.2, 1962.2.1.

### C.    The Litigation Is in the Early Stages.

On March 12, 2026, Plaintiffs initiated this action by filing their complaint. *See* Compl., ECF No. 1. After the complaint was served, Plaintiffs and CARB jointly sought and obtained multiple extensions of CARB's response deadline to allow time for discussions and case management. On April 23, the Court entered a stipulation and order extending CARB's deadline to respond to May 26, 2026. ECF No. 12. Most recently, Plaintiffs and Defendants filed a joint stipulation and proposed order to set a briefing schedule for Defendants' Motion to Dismiss, ECF No. 13, which this Court entered, ECF No. 14.

## III.    ARGUMENT

Plaintiffs challenge CARB's adoption and implementation of standards intended to increase the fuel economy of light-duty vehicles and decrease the use of and demand for liquid fuels produced, marketed, supplied, and/or sold by Plaintiff Intervenors' members. The interests of Plaintiff Intervenors and their members are therefore squarely at stake in this litigation, and Plaintiff Intervenors' participation is essential to ensuring those interests are fully and adequately represented. Because the outcome of this case may profoundly affect the operational and economic vitality of Plaintiff Intervenors' members that produce, market, supply, and/or sell the fuels directly affected by California's attempt to reduce fuel consumption or ban light-duty vehicles that use such fuels, Plaintiff Intervenors easily satisfy the standards for intervention as of right under Rule 24(a) and, at a minimum, the requirements for permissive intervention under Rule 24(b).

7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

A.      **Plaintiff Intervenors Have Standing to Sue in Support of Plaintiffs.**

Plaintiff Intervenors' members have standing to sue in their own right. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977). The principal legal question addressed here—whether CARB's $CO_2$ standards and ZEV mandate are preempted by EPCA—directly affects the stringency of the fuel economy standards applicable to light-duty vehicles in California and other states adopting California standards, which in turn directly affects the demand for the liquid fuels, and raw materials used for liquid fuels, produced, marketed, supplied, and/or sold by Plaintiff Intervenors' members. *See* 90 Fed. Reg. 24,507 at 24,522 (June 11, 2025); Grissom Decl. ¶¶ 12–15 (explaining the direct impact of fuel economy standards on demand for liquid fuels produced by AFPM members); Graziosi Decl. ¶¶ 6–9 (same for NACS); Lipscomb Decl. ¶¶ 6–11 (same for EMA). As the accompanying declarations explain (and common sense confirms), depressing demand for liquid fuels financially injures entities that would otherwise sell that fuel and corresponding raw materials. *See id.*; *see also Diamond Alt. Energy*, 606 U.S. at 118 ("The [fuel producers'] declarations further quote California's estimate that its [ACC I] standards would produce 'substantial reductions in demand for gasoline exceeding $1 billion beginning in 2020 *and increasing to over $10 billion in 2030*.'" (emphasis in original)). This depressed demand would thus constitute an Article III injury-in-fact traceable to the challenged CARB $CO_2$ standards and ZEV mandate and redressable by an order invalidating those requirements as preempted by EPCA. Indeed, the U.S. Supreme Court previously found that AFPM and NACS had standing to challenge the federal approval of the same ACC I regulations challenged here. *See Diamond Alt. Energy*, 606 U.S. at 116–118 (holding petitioner fuel producers—including AFPM and NACS— "readily demonstrated" standing to challenge the federal Clean Air Act waiver for ACC I rules forcing automakers to produce more vehicles that use "significantly less gasoline and other liquid

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

fuels," as such rules would cause "predictable" injuries fairly redressed by rescinding such rules); *Collins v. Yellen*, 594 U.S. 220, 243 (2021). EMA is no different.

Plaintiff Intervenors also satisfy the other elements of associational standing. The members' interests Plaintiff Intervenors seek to protect are directly germane to their mission, which includes participating in litigation affecting their members. *See* Grissom Decl. ¶ 2; Graziosi Decl. ¶ 2; Lipscomb Decl. ¶ 2. Participation by individual members in this litigation is not necessary. *See Hunt*, 432 U.S. at 342–43. As an association representing companies that produce, market, supply, and/or sell the fuels affected by CARB's $CO_2$ standards and ZEV mandate, each Plaintiff Intervenor's interests are coextensive with those of its members, as discussed *infra* in section B.1. *See Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 821 n.3 (9th Cir. 2001) (noting the "implicit" overlap between the associational standing doctrine and the "interest" analysis under Rule 24(a)(2)).

**B.     Plaintiff Intervenors Are Entitled to Intervene as of Right.**

Federal Rule of Civil Procedure 24(a) requires courts, "[o]n timely motion," to permit intervention by anyone who "claims an interest relating to the property or transaction that is the subject of the action" and who "is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a).

Courts have long emphasized that Rule 24(a) must be construed "broadly in favor of proposed intervenors," recognizing that the rule "serves both efficient resolution of issues and broadened access to the courts." *U.S. v. City of L.A.*, 288 F.3d 391, 397–98 (9th Cir. 2002). Consistent with that principle, courts "follow practical and equitable considerations" when evaluating motions to intervene. *Kelly v. Ironshore Indem., Inc,* 2023 WL 12022685, at *3 (C.D.

Cal. Sept. 15, 2023) (quoting *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011)).

Courts apply a four-part test to determine whether a proposed intervenor satisfies the requirements for intervention as of right: (1) the applicant must assert a "significantly protectable interest relating to the property or transaction which is the subject of the action;" (2) the applicant must show that the disposition of the action "may as a practical matter impair or impede its ability to protect that interest;" (3) the motion must be timely; and (4) the applicant's interests must not be adequately represented by the existing parties. *Wilderness Soc'y*, 630 F.3d at 1177 (cleaned up). In evaluating these factors, courts take a liberal, pragmatic approach. They are required to "take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer in intervention, and declarations supporting the motion as true absent sham, frivolity or other objections." *Sw. Ctr. for Biological Diversity*, 268 F.3d at 820.

### 1.    Plaintiff Intervenors Are Key Stakeholders with Significantly Protectable Interests.

A proposed intervenor demonstrates a significantly protectable interest when its asserted interest is "protectable under some law and . . . there is a relationship between the legally protected interest and the claims at issue." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (citation omitted). This is a "practical, threshold inquiry," not a demanding one; the moving party need not establish a "specific legal or equitable interest." *Id.* (citation omitted). Rather, the "interests test" exists to facilitate resolution of disputes "by involving as many apparently concerned persons as is compatible with efficiency and due process." *Wilderness Soc'y*, 630 F.3d at 1179 (citation omitted). The relationship requirement is satisfied so long as "the resolution of the plaintiff's claims actually will affect the applicant." *City of L.A.*, 288 F.3d at 398 (citation omitted). And where a party meets the standing requirements of

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

Article III, that party likely meets the standards of Rule 24(a) intervention. *See Diamond v. Charles*, 476 U.S. 54, 68–69 (1986) (implying the protectable interest under Rule 24(a) is a less burdensome standard than Article III standing).

Plaintiff Intervenors easily meet this standard. The challenged $CO_2$ standards and ZEV mandate will "affect" Plaintiff Intervenors' members—both immediately and in the future—because these regulations directly affect the demand for the liquid fuels produced, marketed, supplied, and/or sold by Plaintiff Intervenors' members. *See Diamond Alt. Energy*, 606 U.S. at 114–116 ("The [ACC I] regulations likely cause fuel producers' monetary injuries because the regulations likely cause a decrease in purchases of gasoline and other liquid fuels for automobiles. Indeed, that is the whole point of the regulations."). Plaintiff Intervenors' interest is also apparent in their own litigation, which has challenged federal standards or agency action that would similarly decrease the demand for these liquid fuels. *See, e.g.*, *AFPM v. NHTSA*, No. 22-1145 (D.C. Cir.); *In re: NHTSA*, No. 24-7001 (6th Cir.); *AFPM v. EPA*, No. 24-1195 (D.C. Cir.); *AFPM v. EPA*, No. 25-1085 (D.C. Cir.). Plaintiffs, through their members, have a direct and substantial legal and economic interest in the continued production and sale of these fuels.

> 2.    The Disposition of This Action Would Impair Plaintiff Intervenors' Interests.

For the same reasons, Plaintiff Intervenors have a protectable interest in this action, and a disposition of this action in Defendants' favor would substantially impair that interest. The Ninth Circuit follows the Rule 24 advisory committee's guidance that, "[i]f a[] [potential party] would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." *Sw. Ctr. for Biological Diversity*, 268 F.3d at 822 (citation omitted). This standard is intentionally pragmatic, focusing on real-world consequences rather than abstract legal impairments.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

Here, those consequences are unmistakable. As described above, should this Court uphold CARB's $CO_2$ standards and ZEV mandates, that ruling would adversely affect demand for Plaintiff Intervenors' members' products and potentially preclude challenges to future attempts by CARB to impose similar regulations related to fuel economy. Given the immediate and future harm to fuel demand resulting from CARB's unilateral overstepping of its authority, Plaintiff Intervenors' members would face immediate and severe impacts to their interests.

### 3.    This Motion Is Timely.

Plaintiff Intervenors' motion is timely because the litigation is in its early stages and no party would be prejudiced by prompt intervention. Timeliness under Rule 24 is a "flexible" concept guided by "equitable considerations." *Canatella v. Cal.*, 404 F.3d 1106, 1113 (9th Cir. 2005). Courts evaluate timeliness under Rule 24(a) by considering three factors: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 854 (9th Cir. 2016) (citation omitted). Each factor supports intervention.

*First*, Plaintiff Intervenors seek intervention at a very early stage of the litigation, well before the Court has "substantively—and substantially—engaged the issues" in the case. *W. Watersheds Project v. Haaland*, 22 F.4th 828, 836 (9th Cir. 2022) (quoting *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1303 (9th Cir. 1997)). Plaintiffs filed their complaint on March 12, 2026, and Plaintiff Intervenors are moving to intervene by the May 26, 2026, deadline for Defendants to answer.

*Second*, Plaintiff Intervenors' intervention will not prejudice any existing party. Plaintiff Intervenors have worked cooperatively with all parties to ensure that their participation would not disrupt a proposed briefing schedule. Most notably, counsel for Plaintiff Intervenors has been in regular communication with Plaintiffs' and Defendants' counsel regarding the timing of its

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

intervention to ensure neither party was prejudiced in the process. Neither side has outrightly opposed Plaintiff Intervenors' motion, deciding instead to take no position, although Defendants have reserved the right to take a position upon seeing the filed motion. Intervention under these circumstances cannot reasonably be viewed as prejudicial.

*Third*, the "reason and length of delay" also favor a finding of timeliness. A little over a month passed between Plaintiffs' filing of their complaint and Plaintiff Intervenors' outreach to party counsel to confer regarding their intent to intervene and the timing thereof. Given the time to coordinate member interests and agreement to move to intervene, and Plaintiff Intervenors' decision to coordinate timing with parties' counsel given the parties' continued efforts to stipulate to extended briefing schedules, it is unreasonable to even view the timing of this motion as a "delay."

4.      The Existing Parties Do Not Adequately Represent Plaintiff Intervenors' Interests.

Finally, none of the existing parties adequately represents Plaintiff Intervenors' interests in this litigation. Three factors determine adequate representation: "(1) whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect." *Sw. Ctr. for Biological Diversity*, 268 F.3d at 822. Plaintiff Intervenors' burden here is "minimal:" they need only show that the existing parties' representation "may be" inadequate, meaning the United States Plaintiffs are unlikely to "advance the same arguments as Applicants." *Id.* at 823, 824. Importantly, there is no presumption of aligned interests between the government and a private party simply because "both entities occupy the same posture in the litigation." *Citizens for Balanced Use*, 647 F.3d at 899 (citation omitted).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

To begin, Defendants plainly do not represent Plaintiff Intervenors' interests. They seek to defend the very regulations that Plaintiff Intervenors challenge and that directly harm their members. Defendants' interests are not only misaligned with Plaintiff Intervenors'—they are directly adverse.

Plaintiffs also cannot adequately represent Plaintiff Intervenors' interests. First, Plaintiffs themselves regulate the very type of standard at issue in this case—standards related to fuel economy. Thus, Plaintiffs' institutional mission and responsibilities necessarily differ from those of privately operated fuel producers and retailers. The Ninth Circuit has recognized that a government entity "cannot be expected . . . to protect [] private interests" where the government entity and private plaintiff have diverging interests—e.g., profit-driven versus public-interest driven. *See Sw. Ctr. for Biological Diversity*, 268 F.3d at 823; *see also Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003) ("[W]e have often concluded that governmental entities do not adequately represent the interests of aspiring [private] intervenors.").

Plaintiff Intervenors and Plaintiffs have fundamentally different institutional interests. Plaintiffs do not share Plaintiff Intervenors' members' economic or operational interests, nor do they have day-to-day experience in or responsibility for responding to fuel demands. While Plaintiff Intervenors must act in the interests of their members to produce, market, supply, and/or sell liquid fuels, among others, Plaintiffs represent public interests, are responsible for "administering EPCA's automobile fuel economy provisions in 49 U.S.C. Chapter 329[]", and seek to "vindicate the supremacy of federal law[]," Compl. ¶¶ 11–13. Notably, the United States itself has recognized that its own "concern for the proper application of its laws, along with its duty to represent the public, mean that its interests are not coterminous with those of private litigants." *See, e.g.*, United States's Mem. in Support of Mot. to Intervene as Pl. at 15, *Am. Free*

14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

*Enter. Chamber of Com. v. Engine Mfrs.' Ass'n*, No. 2:25-cv-003255 (N.D. Ill. Aug. 13, 2025), ECF No. 122.

Further, Plaintiff Intervenors' interests are directly adverse to NHTSA in pending litigation on similar subject matter in two circuits.[10] *See State v. Dir., U.S. Fish & Wildlife Serv.*, 262 F.3d 13, 20 (1st Cir. 2001) ("[T]he former adversary relationship between the government and proposed intervenors may raise questions about adequacy . . . "). Although those cases are currently in abeyance, there is no assurance they will be dismissed rather than reactivated. Given the distinct possibility that Plaintiff Intervenors will continue challenging the *federal* fuel economy standards at issue in those cases, it is critical that Plaintiff Intervenors have a full and fair opportunity to participate in this *state* fuel economy standards proceeding. Although the statutory questions are not the same between these causes, Plaintiff Intervenors and NHTSA may take different views of threshold questions here that could affect both parties' positions in other cases.

Finally, although Plaintiff Intervenors seek to intervene in support of the United States in this case, they often challenge federal regulatory actions as plaintiffs or petitioners. Plaintiff Intervenors may therefore hold different views from the Plaintiffs on related but not yet raised threshold questions, such as the scope of the Clean Air Act or EPCA. Because Plaintiff Intervenors meet the "minimal" showing that its interests "may be" inadequately represented, the adequacy requirement under Rule 24(a) is satisfied.

**C.    Alternatively, Plaintiff Intervenors Satisfy the Standard for Permissive Intervention.**

Permissive intervention under Rule 24(b) is also appropriate. Rule 24(b) authorizes courts to permit intervention when the movant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). Permissive intervention should be granted

---

[10] *AFPM v. NHTSA*, No. 22-1145 (D.C. Cir.); *In re: NHTSA*, No. 24-7001 (6th Cir.).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

when three factors are present: "(1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 843 (9th Cir. 2011) (citation omitted).

Plaintiff Intervenors meet each of these criteria. *First*, this case arises under federal law, and Plaintiff Intervenors assert no new claims; they seek to separately challenge CARB's $CO_2$ standards and ZEV mandate and could bring a claim on their own. Without intervention, the Court would likely face an action to consolidate, and thus, intervention here separately serves to maximize judicial efficiency. *Second*, as explained above, Plaintiff Intervenors' motion is timely and will not prejudice any current party to the litigation. *Third*, Plaintiff Intervenors' claims raise multiple common questions of law and fact with issues already presented in this litigation. Plaintiffs' claims turn on whether CARB's $CO_2$ standards and ZEV mandate constitute a standard related to fuel economy and, thus, whether EPCA preempts such a standard. As set forth in their proposed complaint-in-intervention, Plaintiff Intervenors intend to bring the same main action and address these same questions, drawing on their members' expertise and understanding of the relationship between tailpipe emissions, ZEV mandates, and fuel economy—particularly the direct relationship between increased fuel economy and decreased demand for the hydrocarbon-based liquid fuels supplied by Plaintiff Intervenors' members. *See* Ex. 1 to Motion to Intervene (Proposed Complaint-in-Intervention).

Because Plaintiff Intervenors satisfy all three elements of Rule 24(b) and its participation will contribute to the just and efficient resolution of this action without unduly delaying the case, the Court should permit Plaintiff Intervenors to intervene as of right or, in the alternative, permissively.

16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

## IV.    CONCLUSION

For these reasons, Plaintiff Intervenors AFPM, NACS, and EMA respectfully request that the Court grant this motion to intervene.

DATED: May 26, 2026                                       Respectfully Submitted


By: */s/ Maureen Gorsen*


Justin A. Savage (*pro hac vice* forthcoming)
Daniel J. Feith (*pro hac vice* forthcoming)
jsavage@sidley.com
dfeith@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

Maureen Gorsen (SBN 170158)
Brooklyn Hildebrandt (SBN 350707)
mgorsen@sidley.com
bhildebrandt@sidley.com
SIDLEY AUSTIN LLP
350 S. Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

17

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 26th day of May, 2026, a true and complete copy of the foregoing has been filed with the Clerk of the Court pursuant to the Court's electronic filing procedures, and served on counsel of record via the Court's electronic filing system.

*/s/ Maureen Gorsen*

18
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE