ROB BONTA, State Bar No. 202668
Attorney General of California
MYUNG J. PARK, State Bar No. 210866
Supervising Deputy Attorney General
BENJAMIN P. LEMPERT, State Bar No. 344239
M. ELAINE MECKENSTOCK, State Bar No. 268861
SARAH M. PFANDER, State Bar No. 347902
MARGARET V. TIDES, State Bar No. 311177
CAITLAN MCLOON, State Bar No. 302798
Deputy Attorney General
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6438
  Fax:  (916) 731-2128
  E-mail:  Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants California Air
Resources Board and Steven S. Cliff, in his
capacity as the Executive Officer of the
California Air Resources Board*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA and UNITED STATES DEPARTMENT OF TRANSPORTATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA AIR RESOURCES BOARD and STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board,**<br><br>Defendants. | 2:26-cv-00847-DJC-SCR<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Date:       August 27, 2026<br>Time:      1:30 p.m.<br>Dept:      7<br>Judge:    The Honorable Daniel J. Calabretta<br><br>Trial Date: TBD<br>Action Filed: 3/12/2026 |

1

PLEASE TAKE NOTICE that, on August 27, 2026, at 1:30 p.m., or as soon thereafter as the matter may be heard, before the Honorable Daniel J. Calabretta, United States District Judge, in Courtroom 7 of the United States District Court for the Eastern District of California, located at 501 I Street, Sacramento, CA 95814, Defendants California Air Resources Board (CARB), and Steven S. Cliff, in his official capacity as Executive Officer of CARB, will and hereby do move this Court to dismiss Plaintiffs United States of America and United States Department of Transportation's Complaint for Declaratory and Injunctive Relief, pursuant to Federal Rule of Civil Procedure 12(b)(1).

This Motion to Dismiss is brought on the grounds that Plaintiffs lack standing to bring this action.  Defendants' Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice and attached papers, all documents in the Court's file, and other such written and oral argument as may be presented to the Court.

Per this Court's standing order, the undersigned counsel for Defendants hereby certifies that the parties met and conferred on July 1, 2026 concerning the substance of this motion. Plaintiffs disagree that dismissal is warranted; accordingly, meet-and-confer efforts have been exhausted.

Dated:  July 7, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ Caitlan McLoon*

CAITLAN MCLOON
Deputy Attorney General
*Attorneys for Defendants California Air Resources Board and Steven S. Cliff, in his capacity as the Executive Officer of the California Air Resources Board*

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FAC (2:26-cv-00847-DJC-SCR)

**TABLE OF CONTENTS**

**Page**

Memorandum of Points and Authorities ...............................................................................1

Introduction ...........................................................................................................................1

Background.............................................................................................................................2

    I.     The Clean Air Act Allows for Two Programs Relating to New Motor Vehicle Emissions: EPA's and California's....................................................2

    II.    The Energy Policy and Conservation Act of 1975 Established a Federal Fuel Economy Program ....................................................................3

    III.   California's Advanced Clean Cars I Standards .............................................4

    IV.   Legal Challenges Relating to the Advanced Clean Cars I Standards........7

Legal Standard ......................................................................................................................8

Argument ...............................................................................................................................9

    I.     Plaintiffs Lack Standing to Challenge the ACC I ZEV Standards (Second Cause of Action)...................................................................................10

          A.    Plaintiffs Cannot Establish Standing from the ACC I ZEV Standards.......................................................................................11

               1.    Plaintiffs' Alleged Injuries from the ACC I ZEV Standards Stem from the Inoperative ZEV Sales Requirement .....................................................................12

               2.    Plaintiffs cannot establish standing on the basis of a *per se* injury to sovereign interests from the ACC I ZEV Standards ..............................................................16

          B.    Plaintiffs Cannot Establish Standing on the Basis of Hypothetical Future ZEV Standards ................................................18

    II.    Plaintiffs Lack Standing to Challenge the GHG Standards of ACC I (First Cause of Action)...................................................................................19

          A.    Plaintiffs Cannot Establish Standing from the ACC I GHG Standards.......................................................................................20

               1.    The United States fails to establish an injury in fact attributable to the ACC I GHG Standards..........................20

                2.    Alleged injuries to third parties are insufficient to confer standing on Plaintiffs .................................................23

          B.    Plaintiffs Cannot Establish Standing on the Basis of Hypothetical Future GHG Standards ...............................................25

Conclusion ...........................................................................................................................25

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Altria Grp., Inc. v. Good*
555 U.S. 70 (2008) ...............................................................................................16

*Arizona v. United States*
567 U.S. 387 (2012) ..............................................................................................17

*Arizona v. Yellen*
34 F.4th 841 (9th Cir. 2022) ........................................................................... 17, 18

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ................................................................................................9

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007) ................................................................................................9

*Cal. Tow Truck Ass'n v. City & County of San Francisco*
693 F.3d 847 (9th Cir. 2012) ................................................................................18

*California v. EPA*
Case No. 1:26-cv-02185 (D.D.C., filed June 22, 2026)...................................8

*California v. United States*
Case No. 4:25-cv-04966 (N.D. Cal., filed June 12, 2025)............................6

*California v. Watt*
668 F.2d 1290 (D.C. Cir. 1981) ...............................................................................3

*Carney v. Adams*
592 U.S. 53 (2020) ................................................................................................24

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*
529 F. Supp. 2d 1151 (E.D. Cal. 2007) (as corrected Mar. 26, 2008) ........................4

*Close v. Sotheby's, Inc.*
909 F.3d 1204 (9th Cir. 2018)........................................................................ 16, 18

*Common Cause v. Dep't of Energy*
702 F.2d 245 (D.C. Cir. 1983) ................................................................................3

*Diamond Alternative Energy, LLC v. EPA*
606 U.S. 100 (2025)................................................................................................3

ii

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Driftless Area Land Conserv. v. Valcq*
16 F.4th 508 (7th Cir. 2021) ...................................................................16

*Engine Mfrs. Ass'n v. EPA*
88 F.3d 1075 (D.C. Cir. 1996) ..................................................................3

*FDA v. All. for Hippocratic Med.*
602 U.S. 367 (2024)......................................................................*passim*

*First Choice Women's Resource Ctrs., Inc. v. Davenport*
146 S. Ct. 1114 (2026) ............................................................................13

*Gibbons v. Ogden*
22 U.S. (9 Wheat.) 1 (1824)....................................................................18

*Gonzalez v. Planned Parenthood of Los Angeles*
759 F.3d 1112 (9th Cir. 2014)...................................................................9

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*
508 F. Supp. 2d 295 (D. Vt. 2007) ...........................................................4

*Int'l Union v. Marshall*
584 F.2d 390 (D.C. Cir. 1978) ..................................................................3

*Kumar v. Koester*
131 F.4th 746 (9th Cir. 2025) .................................................................19

*Leite v. Crane Co.*
749 F.3d 1117 (9th Cir. 2014).................................................................9

*Lujan v. Defs. of Wildlife*
504 U.S. 555 (1992).................................................................9, 10, 24

*Minnesota Auto Dealers Association v. Minnesota*
520 F. Supp. 3d 1126 (D. Minn. 2021)............................................ 18, 19

*Motor & Equip. Mfrs. Ass'n v. EPA* (*MEMA I*)
627 F.2d 1095 (D.C. Cir. 1979)............................................................2, 5

*Murphy v. Nat'l Collegiate Athletic Ass'n*
584 U.S. 453 (2018)........................................................17, 18, 19

*Ohio v. EPA*
98 F.4th 288 (D.C. Cir. 2024) ......................................................... 3, 4, 8

iii

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Ohio v. EPA*
  Case No. No. 22-1081 (D.C. Cir., filed May 12, 2022) ...................................................8

*Pistor v. Garcia*
  791 F.3d 1104 (9th Cir. 2015) ...................................................................................9

*Rinnai Am. Corp. v. S. Coast Air Quality Mgmt. Dist.*
  No. 25-5129, 2026 WL 1912093 (9th Cir. July 2, 2026) ................................................4

*Safe Air for Everyone v. Meyer*
  373 F.3d 1035 (9th Cir. 2004) ...................................................................................9

*Seven Arts Filmed Entm't Ltd. v. Content Media Corp. PLC*
  733 F.3d 1251 (9th Cir. 2013) ...................................................................................9

*Spokeo, Inc. v. Robins*
  578 U.S. 330 (2016) .................................................................................10, 11, 18

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*
  108 F.4th 1128 (9th Cir. 2024) .................................................................................16

*Terenkian v. Republic of Iraq*
  694 F.3d 1122 (9th Cir. 2012) ...................................................................................9

*TransUnion LLC v. Ramirez*
  594 U.S. 413 (2021) ............................................................................................ 9, 19

*United States v. California*
  824 F. Supp. 3d 1079 (C.D. Cal. 2026) ........................................................16, 17, 24

*United States v. City of Arcata*
  629 F.3d 986 (9th Cir. 2010) ...................................................................................10

*United States v. Mattson*
  600 F.2d 1295 (9th Cir. 1979) ...........................................................................10, 11, 24

*United States v. San Jacinto Tin Co.*
  125 U.S. 273 (1888) ............................................................................................ 10, 11

*Watison v. Carter*
  668 F.3d 1108 (9th Cir. 2012) ...................................................................................11

## TABLE OF AUTHORITIES
### (continued)

**Page**

**STATUTES**

42 United States Code
§ 6201(5)............................................................................................................3
§ 6295 ..............................................................................................................4
§ 7408 ..............................................................................................................7
§ 7543(b)(1).......................................................................................................2

49 United States Code
§ 32901(a)(6).....................................................................................................4
§ 32902............................................................................................................23
§ 32902(f) .....................................................................................................4, 22
§ 32919.............................................................................................................4

California Health and Safety Code
§ 43000(a).........................................................................................................2
§ 43013(a).........................................................................................................3
§ 43017 ............................................................................................................3
§ 43018.5(a) ......................................................................................................5

79 Stat. 992 (1965)...............................................................................................2

89 Stat. 871 (1975)...............................................................................................3

89 Stat. 905 (1975)...............................................................................................4

1968 Cal. Stat. 1463.............................................................................................5

**COURT RULES**

Federal Rule of Civil Procedure
Rule 12(b)(1).......................................................................................................8
Rule 12(b)(6).......................................................................................................9

**OTHER AUTHORITIES**

76 Federal Register
40652, 40658 (July 11, 2011) ................................................................................5

78 Federal Register
2112, 2129-30 (Jan. 9, 2013) ................................................................................5
2114 ................................................................................................................6
2114-2115 ..........................................................................................................6
2145 ................................................................................................................7

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FAC (2:26-cv-00847-DJC-SCR)

**TABLE OF AUTHORITIES**
(continued)

**Page**

84 Federal Register
51,310 (Sept. 27, 2019).........................................................................................7

86 Federal Register
74,434, 74,440 (Dec. 30, 2021) ...........................................................................20

87 Federal Register
14,332 (Mar. 14, 2022)..........................................................................................7
14,332, 14377 n.469 (March 14, 2022)................................................................5
14,379 ....................................................................................................................8

89 Federal Register
27,842, 27,907 (Apr. 8, 2024) .............................................................................20
52,540, 52,551 (June 24, 2024)...........................................................................20

90 Federal Register
56,438, 56,461 (Dec. 5, 2025)..............................................................................12
56,461 ..................................................................................................................21
642 (Jan. 6, 2025)..................................................................................................6

California Code of Regulations, Title 13
§ 1960.1(g)(2).........................................................................................................5
§ 1961.1 ..................................................................................................................5
§ 1961.2 ..................................................................................................................7
§ 1961.3 ..................................................................................................................5
§ 1961.3(a)..............................................................................................................7
§ 1961.3(a)(1) .........................................................................................................7
§ 1961.3(a)(1)(A) ....................................................................................................7
§ 1961.3(b)(1) .........................................................................................................7
§ 1961.3(b)(3) .........................................................................................................7
§ 1962.2 ...............................................................................................................5, 6
§ 1962.2.1 ...............................................................................................................6
§ 1962.2(b) ...............................................................................................5, 6, 10, 12
§ 1962.2(b)(1)(A) ...................................................................................................6
§ 1962.2(d)(5) ......................................................................................................5, 6
§ 1962.4(a)..............................................................................................................6

H.R. Rep. No. 94-340 .............................................................................................4

H.R. Rep. No. 94-340 (1975) .................................................................................3

S. Rep. No. 90-403, at 33 (1967)...........................................................................2

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FAC (2:26-cv-00847-DJC-SCR)

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

California enacted its Advanced Clean Cars I standards in 2012 as part of its longstanding regulatory efforts to reduce vehicle emissions and thereby mitigate the severe air pollution challenges faced by the State.  In March 2026, more than 14 years after these standards were promulgated, 13 years after the United States Environmental Protection Agency (EPA) first gave California the greenlight to enforce these standards, and nine years after the relevant standards first applied to California vehicle sales, the United States and United States Department of Transportation (Plaintiffs or the United States) filed this suit, alleging two components of these standards are preempted under the Energy Policy and Conservation Act of 1975 (EPCA).  In the meantime, the challenged standards have either expired or plateaued. The Zero Emission Vehicle (ZEV) Sales Requirement, for example, ended with vehicle sales in model year 2025 and no longer requires the sale of any particular vehicles. And the Greenhouse Gas (GHG) Emission Standards reached maximum stringency in model year 2025, meaning their maximum impact on the California vehicle market was reached more than a year ago.

Plaintiffs seeking to invoke the jurisdiction of a federal court bear the burden of showing that they have Article III standing at the time of filing suit.  And an irreducible constitutional minimum of standing requires an injury in fact that is redressable by a favorable decision.  In this regard, Plaintiffs' First Amended Complaint fares no better than their initial effort.  Plaintiffs provide only conclusory allegations of sovereign injury, which fail to acknowledge the current impact (or lack thereof) of these standards in the vehicle market.  These bare contentions are insufficient to establish a concrete, particularized, and redressable injury to the United States.  Accordingly, the Complaint must be dismissed for lack of jurisdiction.

**BACKGROUND**

**I.    THE CLEAN AIR ACT ALLOWS FOR TWO PROGRAMS RELATING TO NEW MOTOR VEHICLE EMISSIONS: EPA'S AND CALIFORNIA'S**

California has long faced severe air quality challenges and resulting adverse impacts on public health.  Because motor vehicles are substantial sources of pollution, Cal. Health & Saf. Code § 43000(a), California has been setting emission standards for vehicles since the 1950s, *Motor & Equip. Mfrs. Ass'n v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979) (*MEMA I*).

When Congress began requiring federal vehicle emission standards in 1965, it did not initially preempt the States.  Pub. L. No. 89-272, § 202, 79 Stat. 992, 992 (1965).  Two years later, manufacturers "raised the spectre of an anarchic patchwork of federal and state regulatory programs." *MEMA I*, 627 F.2d at 1109.  Congress responded by generally preempting States from setting emission standards for new motor vehicles but required the EPA Administrator to waive that preemption for California, upon request, absent limited conditions.[1]  Pub. L. No. 90-148, § 208(a), (b), 81 Stat. 485, 501 (1967).  In doing so, Congress recognized "the benefits for the Nation to be derived from permitting California to continue its experiments in the field of emissions control . . . and the benefits for the people of California to be derived from letting that State improve on 'its already excellent program[.]'" *MEMA I*, 627 F.2d at 1109–10 (quoting S. Rep. No. 90-403, at 33 (1967)).

Since the enactment of this waiver provision in 1967, California has expanded and strengthened its motor vehicle emissions program to cover additional types of vehicles and to set lower emission levels as new or improved pollution control

---

[1] The current waiver provision requires California to determine that its standards "will be, in the aggregate, at least as protective of public health and welfare as" EPA's.  42 U.S.C. § 7543(b)(1).  Defendant California Air Resources Board makes that finding and then submits a waiver request to EPA.  Following "notice and opportunity for public hearing," EPA "shall . . . waive" Clean Air Act preemption for California unless the record evidence supports one of the three limited findings that permit denial. *Id*.

2

technologies have emerged.  *See, e.g., Ohio v. EPA*, 98 F.4th 288, 295–96 (D.C. Cir. 2024), *rev'd and remanded in part by Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025).  Defendant California Air Resources Board (CARB)—the agency tasked with designing, promulgating, and enforcing the State's motor vehicle pollution control program, *e.g.*, Cal. Health & Saf. Code §§ 43013(a), 43017—has requested, and EPA has granted, more than seventy-five preemption waivers allowing California to enforce its program through all of these iterative amendments.  Thus, for more than half a century, new motor vehicles have been "either 'federal cars' designed to meet the EPA's standards" (and certified by EPA) or "'California cars' designed to meet California's standards" (and certified by CARB).  *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1080 (D.C. Cir. 1996).

## II.    THE ENERGY POLICY AND CONSERVATION ACT OF 1975 ESTABLISHED A FEDERAL FUEL ECONOMY PROGRAM

In the early 1970s, energy efficiency became its own matter of intense public concern.  For six months in 1973–74, several petroleum-exporting countries temporarily slashed production and embargoed exports to the United States.  Motor vehicles were the Nation's single largest end user of petroleum, *see* H.R. Rep. No. 94-340 (1975), and the ensuing energy crisis triggered a "tailspin in the domestic auto market," *Int'l Union v. Marshall*, 584 F.2d 390, 392 (D.C. Cir. 1978).  The crisis "dramatically underscored the nation's dependence on foreign sources of oil." *California v. Watt*, 668 F.2d 1290, 1295 (D.C. Cir. 1981) (per curiam).

In response, Congress enacted EPCA as "an omnibus measure that include[d] a myriad of provisions pertaining to the production, stockpiling, conservation, and pricing of energy resources."  *Common Cause v. Dep't of Energy*, 702 F.2d 245, 246 (D.C. Cir. 1983); *see* EPCA, Pub. L. No. 94-163, 89 Stat. 871 (1975).  EPCA's fuel-economy chapter provided for reductions in oil consumption through "improved energy efficiency of motor vehicles," EPCA, § 2(5), 42 U.S.C. § 6201(5), by way of a corporate average fuel-economy standard: "a performance standard which specifies a

3

minimum level of average fuel economy" that each automaker's fleet must attain, 49 U.S.C. § 32901(a)(6).  Congress also opted to generally preempt any state or local "law or regulation relating to fuel economy standards or average fuel economy standards" whenever a relevant federal fuel-economy standard is in place.  49 U.S.C. § 32919.

When drafting this legislation, Congress understood that other motor vehicle standards, including emission standards, could affect a fleet's fuel economy in both directions.  *See* H.R. Rep. No. 94-340, at 86–87.  Thus, it directed the National Highway Traffic Safety Administration (NHTSA) to consider effects of "Federal standards"– defined to include California "emissions standards applicable by reason of [a Clean Air Act waiver]"–when modifying the initial fuel-economy obligations Congress imposed on automakers.  Pub. L. No. 94-163, 89 Stat. 905 (1975).  Congress also directed NHTSA to consider effects of "Federal motor vehicle standards" (later relabeled "motor vehicle standards of the Government") when prescribing or modifying federal fuel-economy standards.  49 U.S.C. § 32902(f).  For this reason and others, two district courts have held that EPCA does not preempt California vehicular GHG emission standards for which EPA has waived Clean Air Act preemption.  *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 354, 398 (D. Vt. 2007); *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1175, 1179 (E.D. Cal. 2007) (as corrected Mar. 26, 2008).  No court has held otherwise.[2]

**III.    CALIFORNIA'S ADVANCED CLEAN CARS I STANDARDS**

Within this legal landscape, California has regularly advanced new, more stringent motor vehicle standards, in an effort to address the State's persistent air

---

[2] Moreover, the Ninth Circuit recently rejected a claim that EPCA preempted a California air district regulation governing the emission of nitrous oxides from appliances, explaining that while "EPCA grants the DOE the authority to set *energy conservation* standards for appliances, [42 U.S.C.] § 6295, nothing in that grant of authority suggests that the DOE also possesses the authority to dictate state *emissions* standards," as that authority falls within "the framework of 'federal-state collaboration' established by the [Clean Air Act] under the purview of the EPA."  *Rinnai Am. Corp. v. S. Coast Air Quality Mgmt. Dist.*, No. 25-5129, 2026 WL 1912093, at *7 (9th Cir. July 2, 2026) (quoting *Ohio*, 603 U.S. at 283).

4

pollution challenges.  *See MEMA I*, 627 F.2d at 1111.  California historically suffered, and presently suffers, from some of the worst air quality in the country.  California consistently contains the only regions in the United States whose ozone problems (i.e., smog) are "extreme" under the Clean Air Act.  76 Fed. Reg. 40,652, 40,658 (July 11, 2011); 78 Fed. Reg. 2112, 2129–30 (Jan. 9, 2013).  And it has more than half of the nation's ten worst areas for both ozone and particulate matter pollution.  87 Fed. Reg. 14,332, 14,377 n.469 (Mar. 14, 2022).

California's standards have included the nation's first motor vehicle emission standards for smog-forming oxides of nitrogen (NOx).  1968 Cal. Stat. 1463, 1467–71.  These NOx standards drastically reduced the smog-forming emissions from passenger cars.  In 1990, California adopted its first ZEV regulation, which required an increasing percentage of vehicles sold in the state to have no tailpipe emissions at all.  Cal. Code Regs. tit. 13, § 1960.1(g)(2) (1991).  And in 2004 California adopted the nation's first GHG emissions standards for motor vehicles, *see* Cal. Code Regs. tit. 13, § 1961.1, which aimed to reduce the State's contribution to climate change and abate the State's extraordinary climate-related harms, including worsening ozone pollution caused by rising temperatures, *see* Cal. Health & Saf. Code § 43018.5(a).

In 2012 California promulgated a comprehensive update to its light-duty vehicle emissions regulations through a suite of standards referred to as Advanced Clean Cars I (ACC I).  *See* Cal. Code Regs. tit. 13 §§ 1961.3, 1962.2.  The ACC I regulations include three primary components:

ZEV standards.  ACC I included updated ZEV standards, requiring manufacturers to meet specified "ZEV credit percentage" requirements.  Cal. Code Regs. tit. 13, § 1962.2(b) (2012).  A manufacturer satisfied the "ZEV credit percentage" in several ways: by generating credits from sales of qualifying vehicles, purchasing credits from other manufacturers, using excess credits banked in prior years, or applying credits obtained by over complying with the GHG emission requirements.  *See id.* § 1962.2(d)(5).  The number of ZEV credits generated by a vehicle sale

5

depended on the vehicle's zero-emission range. *See id.* For example, a plug-in hybrid vehicle with a "50 mile" electric range earned one credit, while a fully battery-electric vehicle with a "350 mile" range earned four credits. 78 Fed. Reg. at 2114–15. The ZEV credit percentage obligation under ACC I started at 4.5% in 2018 and increased gradually to 22% in 2025. Cal. Code Regs. tit. 13 § 1962.2(b). Because a single ZEV can earn up to four credits, the 22% credit requirement could be satisfied with ZEV sales at only 6% of light-duty vehicles actually sold in California.

"[M]anufacturers develop, manufacture, market and sell vehicles on a yearly cycle," based around vehicle "model year[s]." Decl. of EPA Assistant Administrator Aaron Szabo, Request for Judicial Notice (RJN), Ex. A, at ¶¶ 8–10. While originally structured to remain in effect at 2025 levels for subsequent model years, in 2022 California amended the ACC I ZEV standards to expire after model year 2025. *See* Cal. Code Regs. tit. 13, § 1962.2(b)(1)(A) (2022).[3] On September 15, 2025, CARB issued a notice of emergency rulemaking clarifying (through recodification) that it would still certify zero emission vehicles, in aid of compliance for those manufacturers who are certifying to CARB's ACC I GHG and criteria pollutant standards. *See* Cal. Code Regs. tit. 13, § 1962.2.1 (2026). This rulemaking did not recodify the ACC I ZEV credit percentage requirement or otherwise establish any requirement to sell particular vehicles. *See id.*; *see also id.* § 1962.2 (current).

GHG emission standards. ACC I also updated California's GHG emissions requirements for vehicles in model years 2017–2025 and subsequent years. 78 Fed. Reg. at 2114. These California standards operate on a fleetwide-average basis. Thus, each automaker must sell a fleet of vehicles in California that, on average, produces

---

[3] California promulgated that amendment at the same time as another set of standards—called Advanced Clean Cars II (ACC II)—which included a new set of ZEV requirements applicable to model years 2026 and beyond. *See* Cal. Code Regs. tit. 13, § 1962.4(a) (2022). EPA granted a waiver for the ACC II standards on December 17, 2024. 90 Fed. Reg. 642 (Jan. 6, 2025). On June 12, 2025, the President signed a Resolution, passed by the House and Senate, that purported to disapprove the preemption waiver for ACC II. The validity of this Resolution is subject to active litigation. *See, e.g.*, *California v. United States*, Case No. 4:25-cv-04966 (N.D. Cal. filed June 12, 2025).

6

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FAC (2:26-cv-00847-DJC-SCR)

no more than the prescribed level of GHG emissions for the relevant model year. Cal. Code Regs. tit. 13, § 1961.3(a). Automakers can generate credits by selling fleets with average emissions below the standards or by selling certain ZEVs. *Id.* § 1961.3(b)(1). They can bank those credits for future compliance or sell them to other automakers. *Id.* § 1961.3(b)(3). The standards became stricter over time. *Id.* § 1961.3(a)(1). The ACC I GHG standards reached maximum stringency in vehicle model year 2025, and remain at 2025 levels for "subsequent" model years. *See* Cal. Code Regs. tit. 13, § 1961.3(a)(1)(A) (2012).

Criteria pollutant standards. ACC I also made the longstanding criteria pollutant standards for light-duty vehicles more stringent, beginning with model year 2015. *See id.* § 1961.2 (2012). Criteria pollutants are those for which EPA has established National Ambient Air Quality Standards. *See* 42 U.S.C. § 7408 ("Air quality criteria and control techniques"). Plaintiffs do not challenge the criteria pollutant standards in this suit.

**IV.   LEGAL CHALLENGES RELATING TO THE ADVANCED CLEAN CARS I STANDARDS**

California requested a Clean Air Act waiver for the ACC I standards in 2012. EPA granted the waiver in early 2013, 78 Fed. Reg. at 2145, and nobody challenged that EPA decision or the underlying ACC I standards. More than six years later, during the first Trump administration and as part of a joint rulemaking with NHTSA, EPA withdrew the parts of the 2013 waiver pertaining to the GHG and ZEV standards. 84 Fed. Reg. 51,310 (Sept. 27, 2019). Among other reasons, EPA relied on NHTSA's assertion that state regulation of GHG emissions were preempted by EPCA. *See id.* at 51337–51338. That withdrawal was challenged by California and other parties, and EPA reinstated the relevant portions of the waiver in March 2022, noting that NHTSA had withdrawn its preemption finding. 87 Fed. Reg. 14,332 (Mar. 14, 2022).

A group of states, led by Ohio, and various companies that produce or sell liquid fuels, as well as related trade associations, petitioned for review of EPA's 2022 waiver reinstatement decision. The States argued that EPA's reinstatement violated

7

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FAC (2:26-cv-00847-DJC-SCR)

equal sovereignty principles and was contrary to law, because the ACC I standards at issue were preempted by EPCA.  Fuel petitioners principally argued that EPA's reinstatement of the waiver contravened the Clean Air Act.  The D.C. Circuit concluded that the States lacked standing to bring their EPCA challenge and denied the equal sovereignty claim on the merits; and it concluded that the fuel petitioners lacked standing to bring their Clean Air Act challenge.  *Ohio*, 98 F.4th at 294–96.  The Supreme Court granted certiorari on the question of the fuel petitioners' standing, ultimately concluding that the fuel petitioners did have standing to challenge the reinstatement of the waiver and remanding back to the D.C. Circuit.  *Diamond Alt. Energy*, 606 U.S. at 105.  At EPA's request, that case has been in abeyance since it was remanded on June 20, 2025.  *See Ohio v. EPA*, Case No. No. 22-1081 (D.C. Cir., filed May 12, 2022).

The United States filed the present suit, alleging the GHG standards and ZEV sales requirement of ACC I are preempted under EPCA, in March 2026.  After Defendants moved to dismiss the complaint for lack of standing, Dkt. No. 15, the United States filed an amended complaint pleading the same claims, Dkt. No. 27.

On June 12, 2026, EPA announced that it had "determined" that the original 2013 waiver for ACC I and the 2022 reinstatement of the parts of that waiver corresponding to the standards at issue here were "rules," departing from the position EPA took in these waiver actions when it finalized them.  *Compare* EPA Press Release of June 12, 2026, RJN, Ex. B, *with* 87 Fed. Reg. at 14,379 ("As with past waiver decisions, this action is not a rule . . . .").  EPA claims it did so to provide Congress with the "opportunity to review these rules" under the Congressional Review Act.  RJN, Ex. B.  California has challenged and sought to preliminarily enjoin these recent actions by EPA.  *California v. EPA*, Case No. 1:26-cv-02185 (D.D.C., filed June 22, 2026).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss a complaint on the basis that there is no subject matter jurisdiction, including a lack of

8

standing. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). The party asserting jurisdiction has the burden of proving it exists. *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.*

"The district court resolves a facial attack" on standing under Rule 12(b)(1) "as it would a motion to dismiss under Rule 12(b)(6)," by determining whether the plausible allegations in the complaint, accepted as true, "are sufficient as a legal matter to invoke the court's jurisdiction." *Leite*, 749 F.3d at 1121. Applying the standards set forth in *Iqbal* and *Twombly*, the complaint must clearly allege each element of standing with "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012) (applying *Iqbal* to allegations supporting jurisdiction). Legal conclusions that are couched as factual allegations may be disregarded by the district court. *See Iqbal*, 556 U.S. at 678–79. And a court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *Seven Arts Filmed Entm't Ltd. v. Content Media Corp. PLC,* 733 F.3d 1251, 1254 (9th Cir. 2013), or "contradict matters properly subject to judicial notice," *Gonzalez v. Planned Parenthood of Los Angeles,* 759 F.3d 1112, 1115 (9th Cir. 2014).

## ARGUMENT

To meet their burden, Plaintiffs must plead facts sufficient to establish that all three elements of standing were met as of the time it filed suit. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 569 n.4 (1992). Specifically, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the

9

defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted).

These standing requirements apply equally to the federal government as they to do to any other private or government plaintiff: "the government must show that, like the private individual, it has such an interest in the relief sought as entitles it to move in the matter." *United States v. Mattson*, 600 F.2d 1295, 1300 (9th Cir. 1979) (quoting *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 285 (1888)). Additionally, where the plaintiffs are "not the target of the challenged government action," their ability to bring suit is "'substantially more difficult' to establish." *United States v. City of Arcata*, 629 F.3d 986, 989 (9th Cir. 2010) (quoting *Lujan*, 504 U.S. at 562). Plaintiffs have not met their burden.

## I.   PLAINTIFFS LACK STANDING TO CHALLENGE THE ACC I ZEV STANDARDS (SECOND CAUSE OF ACTION)

Plaintiffs' second cause of action alleges injury from the ZEV sales percentage requirements of ACC I. First Am. Compl. (FAC) ¶ 100, Dkt. No. 27. But these ZEV sales requirements terminated with model year 2025. Cal. Code Regs. tit. 13, § 1962.2(b). Thus, under ACC I no manufacturer is required to sell any particular percentage of ZEVs for the current model year or for future model years. It is unreasonable to infer that the federal government is experiencing any of its alleged injuries from standards that no longer govern vehicle sales. *See* FAC ¶¶ 6–14 (identifying the United States' claimed injuries as stemming from California's purportedly "more stringent requirements," which "compel[] the market penetration" of ZEVs).

Plaintiffs seek to sidestep this problem in two ways. First, they argue that because certain other aspects of the ACC I ZEV regulations remain in place–for example, provisions allowing manufacturers until September 2026 to update required annual reports and make up for credit deficits from model year 2025–the ZEV sales

requirement still results in an injury-in-fact.  FAC ¶ 57.  But none of the aspects of the program Plaintiffs cite to result in the harms they plead.

Second, they argue that CARB's ZEV standards "inherently" result in an injury-in-fact by conflicting with the federal government's "exclusive responsibility to establish nationwide, uniform vehicle fuel economy standards."  FAC ¶ 7.  But other courts have rejected this *per se* theory of sovereign injury for standing.  And in any event, Plaintiffs fail to allege any facts substantiating an actual conflict with NHTSA's statutory role to set fuel economy standards based on the criteria identified in EPCA, or any other concrete harm flowing to the federal government.

Plaintiffs' failure to allege any redressable current or future injury from these standards, which applied only to vehicle sales in model years that ended before this suit began, is fatal to this claim.  Thus, Plaintiffs' second cause of action should be dismissed without leave to amend.  *Watison v. Carter*, 668 F.3d 1108, 1117 (9th Cir. 2012) (dismissal without leave to amend is appropriate when the court "determines that the pleading could not possibly be cured by the allegation of other facts").

### A.    Plaintiffs Cannot Establish Standing from the ACC I ZEV Standards

To establish injury in fact, a plaintiff must show that he or she suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (citation omitted).  For an injury to be particularized, the plaintiff must show that the challenged conduct "affect[s] the plaintiff in a personal and individual way."  *Id*. (internal quotation marks omitted).  This requirement "has not been limited to private individuals and organizations, but held to include governmental units as well."  *Mattson*, 600 F.2d at 1300; *see also San Jacinto Tin Co.*, 125 U.S. at 285.  This is because "federal courts do not issue advisory opinions about the law—even when requested by the President."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378–79 (2024).

### 1.    Plaintiffs' Alleged Injuries from the ACC I ZEV Standards Stem from the Inoperative ZEV Sales Requirement

In its amended complaint, the only concrete injuries the United States alleges stem from the imposition of ZEV mandates that "compel[] the market penetration" of zero-emission technology, and "requir[e] vehicle manufacturers to sell substantial numbers of EVs to California customers." FAC ¶ 11. Specifically, the United States claims that such "ZEV mandates" alter the composition of vehicle fleets and impair the interests of the United States in ensuring "consumers' access to and choice of reliable, affordable motor vehicles." *Id.* Plaintiffs argue that "[t]he shift away from petroleum-based fuels forced by" the ZEV mandates implicates "billions of dollars and many jobs that the petroleum refining industry annually contributes to the national economy." *Id.* ¶ 12. It is these "forced changes," in their view, that "distort the national vehicle marketplace," and "interfere with NHTSA's balancing of statutory factors and setting of fuel economy standards." *Id.* ¶ 13. Plaintiffs' claimed injuries thus depend on the imposition of standards that in fact coerce changes to the vehicle fleet.

However, as the ZEV sales percentage requirement has definitively ended, these standards cannot possibly be currently impeding the functions of the federal government or otherwise causing the injuries Plaintiffs allege. And the relevant regulatory text is unambiguous on this point: the percentage ZEV sales requirements do not apply beyond light-duty vehicle model year 2025. Cal. Code Regs. tit. 13, § 1962.2(b). Plaintiffs did not initiate this suit until March 2026, at which point model year 2025 was over. *See* Szabo Decl., RJN, Ex. A, at ¶ 9 (declaring on April 20, 2026, that "[i]t is public knowledge that manufacturers are currently selling model year 2026 vehicles and will transition to selling model year 2027 vehicles in the second half of the year"); *see also* 90 Fed. Reg. 56,438, 56,461 (Dec. 5, 2025) (NHTSA stating in December 2025 that "for MYs 2022–2025, production is already closed or is in process, and MY 2026 production plans likely are solidified and underway").

12

Despite the plain text of the regulation, Plaintiffs allege that other, operative elements of the ACC I ZEV regulations serve to maintain the "*de facto* market-share quota for electric vehicles," on which their claimed injury depends.  FAC ¶ 56.  But none of the identified aspects of the program can do so.  Take for example, the provisions allowing manufacturers until September 1, 2026, to update required annual reports and make up for credit deficits incurred through model year 2025.  FAC ¶ 57.  By claiming that these provisions leave the "ZEV mandate . . . administratively open," Plaintiffs invite the inference—but do not actually allege—that manufacturers are currently adjusting their vehicle offerings to address credit deficits from prior years.  *Id.*  However, even a cursory review of publicly available government records belies this inference.  As of model year 2024, manufacturers were at 100% compliance with the annual ZEV sales requirement, and fleetwide ending year credit balances far exceeded the annual ZEV sales requirement in that model year.  *See* CARB Annual ZEV Credits Disclosure Dashboard, RJN, Ex. C, at *Trends Tab*, available at https://ww2.arb.ca.gov/applications/annual-zev-credits-disclosure-dashboard (last visited July 7, 2026).  And in the latest publicly available data, all manufacturers subject to the ACC I ZEV standard, including manufacturers that do not make ZEVs, have available credits to purchase for compliance with the sales requirement.  *See* CARB Annual ZEV Credits Disclosure Dashboard, RJN, Ex. D, at *Data Tab*, Balances Chart, available at https://ww2.arb.ca.gov/applications/annual-zev-credits-disclosure-dashboard (last visited July 7, 2026).  Thus, the implication that this remaining window to make up credit deficits coerces additional ZEV market penetration—upon which their claim depends—is not "objectively reasonable."  *First Choice Women's Resource Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1127 (2026).  The United States does not allege that any manufacturer has a current deficit to make up, much less any facts that would support a conclusion that any such manufacturer is likely to sell more ZEVs in the future to make up for a model year 2025 deficit, nor that the volume of any increased ZEVs sales would actually disrupt the national vehicle market.  And indeed,

13

the publicly available data rebuts that conclusion, as manufacturers not currently selling ZEVs have historically relied on the plentiful market of credits available from manufacturers that have surpassed the expired ZEV sales percentage requirements for model year 2025.  *See* RJN, Exs. C, D.

Plaintiffs' other allegations similarly fail to satisfy their burden to establish concrete injury from the ACC I ZEV standard.  That CARB can still pursue enforcement actions related to the ZEV regulations for "many years yet" does not establish that the ZEV sales percentage would change as a result of any such enforcement action, and certainly not in a way to impact the national vehicle market.  FAC ¶ 58.  And any such inference would be unreasonable, given that the model year 2024 data indicates that all manufacturers were in compliance with the ZEV standards, and indeed, far surpassed the required sales percentage.  *See* RJN, Exs. C, D.  Plaintiffs do not plead that any enforcement actions are likely, and any such claim would be contradicted by materials subject to judicial notice.

Moreover, the allegations that CARB has entered into settlement agreements with six major light-duty vehicle manufacturers requiring continuing compliance with the ACC I ZEV regulations through model year 2026, FAC ¶¶ 59–60, are simply inaccurate.  None of the Agreements to which Plaintiffs point require compliance with the ACC I *ZEV standards*; rather, they concern only the separate GHG emissions standards (the subject of the other count in Plaintiffs' complaint).  *See* Framework Agreements*,* RJN, Ex. E, at 1 (BMW NA), 56 (Ford), 106 (American Honda Motor Co.), 158 (Volvo Car USA, LLC), 210 (Volkswagen Group of America, Inc.).  And the zero-emission vehicle commitments made in the Stellantis Agreement concern compliance with CARB's *ACC II* ZEV requirements, which Plaintiffs have not challenged here.  Stellantis Agreement, RJN, Ex. F, at 1, 18; *see also id*. at 31–35 (addressing Stellantis' independent commitment to promoting zero-emission technology).  Nothing in any of these agreements pertains to the ACC I ZEV sales requirements, much less extends

those requirements beyond model year 2025, which, as stated above, ended before this suit was filed.

Finally, Plaintiffs' claim that CARB "is committed" to enforcing the ACC I ZEV regulations "in other ways" is insufficient to establish standing to challenge the ACC I ZEV standards. FAC ¶ 61. None of the "commitments" Plaintiffs name—the August 2025 Manufacturers Advisory Correspondence, RJN, Ex. G, the Governor's Executive Order (N-27-25), RJN, Ex. H, and the emergency rulemaking, which restores CARB's ACC I ZEV certification regulations for the indefinite future, 2026 CA REG TEXT 713359 (NS)—require manufacturers to increase their ZEV sales. *Contra* FAC ¶¶ 61, 67, 68. The United States' claimed injuries (i.e. skewing the market towards ZEV sales, impeding consumer access to affordable, reliable internal combustion engine vehicles, etc.) follow only from the sales requirements, not from advisory notices or regulations explaining how a manufacturer may obtain CARB certification that allows for sale of a particular model in California, and not from an Executive Order directing state agencies to consider future actions.

Plaintiffs' conclusory allegations to the contrary, it is not plausible to infer that a regulation that, on its face, no longer governs which vehicles manufacturers sell, could possibly "prohibit vehicles that the federal fuel economy scheme allows" or otherwise "frustrate" that scheme. *E.g.*, FAC ¶ 102. Nor is it plausible to infer that these standards currently "impair[] the interest of the United States in ensuring American consumers' access to and choice of reliable, affordable motor vehicles." FAC ¶¶ 11–12. The United States fails to allege any facts that could establish that standards which ceased to regulate the number of ZEVs sold in California over a year ago are having *any* effect on the government's fuel-economy standards (or anything else), much less that an order invalidating these standards would redress any alleged injury caused by vehicles manufacturers produced and sold under these standards in model year 2025 and earlier.

**2. Plaintiffs cannot establish standing on the basis of a *per se* injury to sovereign interests from the ACC I ZEV Standards**

Separate and apart from the allegations above, Plaintiffs allege that the "ZEV mandates" of ACC I "inherently result[] in an injury-in-fact" because the ZEV standards directly interfere with the United States' "sovereign interests in issuing, maintaining, and enforcing nationally uniform fuel economy standards[.]"  FAC ¶¶ 6–7.  But the federal government is not injured-in-fact by the mere presence of an allegedly preempted law in a state code of regulations.  *Cf. Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1142 (9th Cir. 2024).  If the reverse were true, the remedy in preemption cases would be to require repeal or, at a minimum, to void the law.  But when courts "adjudge a state law preempted," they "do not render the law null and void in some ultimate sense . . . ; rather, [the] judgment renders the law unenforceable in the case before [the court]."  *Close v. Sotheby's, Inc.*, 909 F.3d 1204, 1209 (9th Cir. 2018); *see also Driftless Area Land Conserv. v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021) ("[T]he federal judiciary . . . has no power to vacate the actions of state agencies.").

The recent decision in *United States v. California*, 824 F. Supp. 3d 1079 (C.D. Cal. 2026), illuminates.  In that case, the United States contends that the federal Egg Products Inspection Act preempts California laws and regulations governing the sale and shipment of eggs produced by hens confined in certain conditions.  *Id*. at 1081.  The court dismissed the United States' first amended complaint on standing grounds, noting that "if [the plaintiff's] preemption theory is correct, the existence of California's laws and regulations governing egg sales and distribution in and of themselves do not harm" the plaintiff, because "'state laws that conflict with federal law are without effect.'"  *Id*. at 1083–84 (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)).  The fact that the state law at issue was enacted and stays on the books cannot violate a federal preemption clause because such a provision "is neither directed to nor violable by any State, and the Supremacy Clause does not itself conjure a substantive

16

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FAC (2:26-cv-00847-DJC-SCR)

right that . . . the United States may vindicate through suit." *Id.* at 1084 (citing *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018)). Indeed in *Murphy*, the Supreme Court made clear that preemption provisions should be read to "confer[] on private entities . . . a federal right to engage in certain conduct subject only to certain (federal) constraints," but not to quash State lawmaking. 584 U.S. at 478–79. In other words, while the enforcement of a preempted law can cause injury, its mere enactment or promulgation cannot. And as discussed above, the ZEV sales requirement is no longer effective and, therefore, presents no redressable injury arising from present or future vehicles sales.

The cases the United States relies on in the FAC to support its theory of "inherent injury" are inapposite. *See, e.g.,* FAC ¶ 6 (citing *Arizona v. United States*, 567 U.S. 387 (2012); *Arizona v. Yellen*, 34 F.4th 841 (9th Cir. 2022)). Standing was not litigated in *Arizona v. United States*; rather, the Supreme Court decision was limited to examining the likelihood of success on the merits in the context of a motion for preliminary injunction and did not address irreparable injury at all, much less determine that the United States is injured every time it alleges a state law is preempted. 567 U.S. 387. Nor does *Arizona v. Yellen* support Plaintiffs' theory. That case addressed a State's standing to challenge the federal government in the face of threatened enforcement by federal officials. 34 F.4th 841. In *Yellen* the court recognized that a government plaintiff, like a private plaintiff, must still allege "sufficiently concrete and particularized harms to its ability to exercise its sovereign prerogatives[.]" *Id.* at 852. The Ninth Circuit concluded that Arizona had done precisely that: it alleged facts sufficient to demonstrate that "it [would] face serious consequences in losing control over its taxing policies and being held to a funding offer that it does not understand." *Id.* at 853. And Arizona had also "alleged a sufficiently credible threat of enforcement" against the State to sustain standing, independent of any theory of sovereign injury. *Id.* at 851. Thus, the allegations of harm in *Yellen* were indeed "sufficiently concrete

and particularized" to support a cognizable theory of standing. *Id.* at 852. As discussed in Section I.A.1 above, no such credible allegations have been made here.

For all these reasons, the United States has failed to establish standing from the expired ZEV percentage requirements of ACC I.

### B.    Plaintiffs Cannot Establish Standing on the Basis of Hypothetical Future ZEV Standards

Plaintiffs go further in seeking to prevent California's adoption of any future ZEV sales requirement. FAC ¶¶ 104, 107–108. But a legally cognizable injury must be both "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (citation omitted). The United States cannot allege any such injury from future standards that have not even been proposed, let alone adopted by CARB. *See All. for Hippocratic Med.*, 602 U.S. at 381 (requiring injury that has "already occurred or [is] likely to occur soon"). Preemption cases concern whether "a state law, 'in [its] application to [a particular] case, come[s] into collision with an act of Congress,'" *Close*, 909 F.3d at 1209 (alterations in original) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 210 (1824)). Thus, "when preemption is claimed, a court must pay careful attention to the particular provisions that a state or local entity seeks to impose." *Cal. Tow Truck Ass'n v. City & County of San Francisco*, 693 F.3d 847, 861 (9th Cir. 2012) (cleaned up). The United States can neither establish standing, nor state a claim, to challenge a state law that has no particular provisions because it does not yet exist. As such, the speculation of future injury from these hypothetical standards cannot establish standing in this suit.

And in any event, neither federal law, nor this Court, can prohibit a state legislative or rulemaking process through preemption. *See Murphy*, 584 U.S. at 479–80. Thus the United States lacks standing to seek any relief that would stop the State from beginning (or completing) such a process. The analysis in *Minnesota Auto Dealers Association v. Minnesota*, 520 F. Supp. 3d 1126 (D. Minn. 2021), is persuasive here. The plaintiffs in that case sought "to enjoin [the defendants] from engaging in

18

administrative rulemaking pertaining to motor vehicle greenhouse gas emissions standards in Minnesota," which plaintiffs alleged were preempted. *Id.* at 1131. Concluding that plaintiffs had failed to establish an injury-in-fact and therefore lacked standing to bring the lawsuit, the district court observed that plaintiffs "neither alleged nor established that engaging in administrative rulemaking is or can be preempted by federal law–a contention that is contrary to law." *Id.* at 1137 (quoting *Murphy*, 584 U.S. at 479–80). Plaintiffs cannot use the Court to enjoin California's administrative process on the theory that such process may eventually result in a preempted standard.

Accordingly, the United States has failed to allege a cognizable theory of standing to assert its second cause of action, and there are no facts Plaintiffs could plead to cure those deficiencies. The second cause of action should be dismissed without leave to re-amend. *See Kumar v. Koester*, 131 F.4th 746, 751 (9th Cir. 2025) (quoting *TransUnion*, 594 U.S. at 431) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim.").

## II.    PLAINTIFFS LACK STANDING TO CHALLENGE THE GHG STANDARDS OF ACC I (FIRST CAUSE OF ACTION)

Unlike the ZEV sales requirements, the GHG Standards of ACC I are operative, now and in subsequent model years. But Plaintiffs have still failed to establish that they suffered or are likely to suffer an injury in fact caused by these GHG standards. As discussed below, the United States has incurred no cognizable injury, both because NHTSA intentionally designed its existing fuel economy standards to be compatible with GHG standards more stringent than ACC I's (meaning there is no inconsistency between the standards) and because these GHG standards are not in any way impeding NHTSA from amending its existing fuel economy standards. Plaintiffs further impermissibly rely on injuries to third parties and fail to establish a causal link between the GHG standards and alleged harm to the federal government. Thus, Plaintiffs lack standing, and this claim should be dismissed.

19

## A.    Plaintiffs Cannot Establish Standing from the ACC I GHG Standards

### 1.    The United States fails to establish an injury in fact attributable to the ACC I GHG Standards

"An injury in fact must be 'concrete,' meaning that it must be real and not abstract." *All. For Hippocratic Med.*, 602 U.S. at 381.  For example, it can be "a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights." *Id*.  But "a general legal, moral, ideological, or policy objection to a particular government action" will not suffice. *Id*.  As discussed above, in the context of a preemption claim the mere existence of allegedly preempted state laws, without more, is not sufficient by itself to establish injury in fact to the federal government.  *See supra* at Section I.A.2.  Beyond simply alleging that the GHG standards are preempted, Plaintiffs here allege two forms of sovereign injury purportedly caused by California's GHG standards: first, an injury based on the allegation that California's regulations are "inconsistent" with NHTSA's existing fuel economy standards, FAC ¶¶ 9–10; and second, an injury based on the allegation that California's regulations impair the federal government's ability to revise national fuel economy standards in a preferred policy direction, FAC ¶¶ 6–13.  Neither allegation identifies an actual or imminent injury.

As an initial matter, Plaintiffs' allegation that California's regulations are "inconsistent" with existing NHTSA regulations, FAC ¶ 9, is refuted by NHTSA's own statements and findings in promulgating its existing fuel standards.  Specifically, "NHTSA coordinated with EPA in developing [its] final rule to avoid inconsistencies" with the EPA emission standards that had recently been promulgated.  89 Fed. Reg. 52,540, 52,551 (June 24, 2024).  The relevant EPA GHG standards were "more stringent . . . for MYs 2027–2032" than the standards EPA had promulgated two years earlier, 89 Fed. Reg. 27,842, 27,907 (Apr. 8, 2024), which were themselves already more stringent than the maximum stringency of ACC I's GHG standards (reached in model year 2025) which was aligned with the standards EPA promulgated in 2012, 86

20

Fed. Reg. 74,434, 74,440 (Dec. 30, 2021) (Figure 1 comparing EPA GHG standards promulgated in 2021 with those promulgated in 2012); *see id.* at 74,457 & n.60 (describing alignment of EPA GHG standards promulgated in 2012 with California's ACC I standards, including "deemed-to-comply" provision that allowed for compliance with the latter through compliance with former).  In other words, NHTSA's existing fuel-economy standards are consistent with GHG emission standards far more stringent than California's standards in ACC I.[4]  The United States thus cannot plausibly allege now that there is any inconsistency with these less stringent standards.  Nor has it attempted to do so.  The Complaint is devoid of any facts that could plausibly support this inference.

California's GHG standards were enacted in 2012, first applied to vehicle model year 2017, and reached maximum stringency more than a year ago, with vehicle model year 2025.  *See* Szabo Decl., RJN, Ex. A, at ¶ 9 (declaring on April 20, 2026, that "manufacturers are currently selling model year 2026 vehicles"); *see also* 90 Fed. Reg. at 56,461 (NHTSA stating, in early December of 2025, that MY 2025 "production is already closed or is in process").  Given this long span of time in which the California GHG standards have already been in operation, one would expect that if there were any concrete harm to the United States arising from the operation of the ACC I GHG standards, Plaintiffs could articulate it with specificity now.  They cannot.  Plaintiffs instead merely advance a conclusory allegation of inconsistency that is contradicted by NHTSA's earlier, specific statements and fails to describe any impairment of federal operations or any other particularized harm.

Plaintiffs next try, unsuccessfully, to suggest that they are impaired from *revising* their existing fuel economy standards according to the statutory criteria identified in EPCA.  *See* FAC ¶¶ 10, 13.  Not so.  Nothing in California law could or does disable

---

[4] EPA has since repealed its GHG emission standards; but that does not alter the fact that NHTSA designed the existing fuel-economy standards to avoid inconsistency with GHG emission standards more stringent than those CARB promulgated in 2012 in ACC I.

21

NHTSA from exercising authority under federal law to set maximum feasible fuel economy standards. Regardless of any state law, NHTSA retains authority to exercise discretion to determine "maximum feasible" fuel economy standards, applying the factors at 49 U.S.C. § 32902(f). California law does not dictate the standard that NHTSA sets or the weight that NHTSA applies to relevant statutory factors.

Noting that "California represents the largest [state] market for automobiles in the country," FAC ¶ 12, Plaintiffs contend that California's standards have contributed to a national shift towards better fuel economy, *id*. ¶ 11, and suggest that improvements in fuel economy might impact NHTSA's assessment of "maximum feasible fuel economy," *id*. ¶ 13. To the extent that existing marketplace conditions inform NHTSA's rulemaking, the United States has not demonstrated any concrete injury arising from the conditions in place antecedent to NHTSA's potential future revision of its existing standards, much less met its causation and redressability burden. Agencies are certainly expected to take relevant, current market conditions into account during rulemakings. But Plaintiffs do not explain how NHTSA's wish that current market conditions were different prevents the agency from promulgating standards or otherwise cognizably injures the United States. Nor have Plaintiffs alleged any non-conclusory facts that could establish that California's standards are the cause of the alleged shift in nationwide improvements in average fuel economy—a notable omission given that EPA's GHG standards (which applied far more broadly than California's) were aligned with, or more stringent than, these ACC I standards over the bulk of the period since 2012. *See supra* 20–21. Underscoring the point, compliance with the federal fuel-economy standards is measured by *averaging* fuel-economy across *all vehicles sold nationwide* by a given automaker in a given model year. FAC ¶¶ 6, 24–25. The vehicles sold in California do not therefore determine an automaker's nationwide average fuel economy. The sales in all 50 States do, and those sales were largely governed by *EPA's* GHG standards. And even if Plaintiffs could allege that the existence of current market conditions injures them and was

22

caused by these California GHG standards, Plaintiffs still fail to allege facts that would support redressability–that automakers would decrease *national* average fuel-economy if GHG standards applicable in one State were rendered unenforceable.

Nor does the mere fact that the federal government has a policy preference in favor of lower fuel economy standards and higher consumption of fossil fuels–a preference wholly at odds with the objectives of EPCA–constitute an injury in fact. *See All. For Hippocratic Med.*, 602 U.S. at 381 ("Article III standing screens out plaintiffs who might have only a general . . . policy objection"). Under Plaintiffs' logic, the United States incurs an injury sufficient for standing purposes where an action is taken that tends to affect the "maximum feasible" fuel economy determination required by EPCA. *See* FAC ¶ 13. But the national vehicle marketplace is affected by innumerable factors beyond California emission standards (e.g., technological advancements, competition among manufacturers, fuel prices, gas taxes, consumer preferences, federal, state, and local incentive programs, etc.). Thus, under its logic, the United States would incur a cognizable injury whenever manufacturers voluntarily elect to make more fuel-efficient vehicles or whenever states impose taxes on the retail sale of gasoline–as such actions could likewise influence the existing-marketplace conditions NHTSA considers in determining "maximum fuel economy" under 49 U.S.C. § 32902, and tend to likewise cut against NHTSA's present policy preferences.

In short, Plaintiffs have failed to establish any sovereign injury in fact from the GHG standard.

### 2.    Alleged injuries to third parties are insufficient to confer standing on Plaintiffs

In the first amended complaint, Plaintiffs additionally allege that "CARB's requirements impact vehicle manufacturers' decisions," FAC ¶ 13, "force carmakers to divert resources," *id*. ¶ 12, and "affect[] billions of dollars and many jobs [in] the petroleum refining industry," *id*. ¶ 12. These allegations describe potential impacts on carmakers and fuel companies, not on the United States. Accordingly, standing is

23

"substantially more difficult to establish." *All. For Hippocratic Med.*, 602 U.S. at 382, quoting *Lujan*, 504 U.S. at 562; *see also Mattson*, 600 F.2d at 1300–01 (dismissing case for lack of standing because the federal government failed to show that it was "among the injured").[5]  Similarly, conclusory allegations about "American consumers' access to and choice of reliable, affordable motor vehicles," FAC ¶ 11, do not establish injury in fact, as such allegations establish only "an abstract general interest common to all members of the public . . . ." *Carney v. Adams*, 592 U.S. 53, 59 (2020) (cleaned up); *cf. United States v. California*, 824 F.Supp.3d at 1983, n.2 ("allegations that the subject laws and regulations harm working-class Americans by effectively inflating egg prices" does not satisfy the injury-in-fact requirement).

The United States has failed to plead facts sufficient to meet its high burden on any such theory.  Plaintiffs' allegations of harm to third parties are conclusory at best: they neither plead any facts establishing any harm to industry or consumers has actually or is likely to occur, nor that any purported changes in the motor vehicle market (and/or petroleum market) are a result of California's GHG standards.  Indeed, Plaintiffs continue to attribute these purported third party injuries indiscriminately to the GHG and ZEV standards simultaneously, *e.g.,* FAC ¶¶ 9–10, even after Defendants raised this attribution problem in their initial motion to dismiss, Dkt. 15 at 23.  As discussed above, any inference Plaintiffs invite that it is California's GHG standards that are the cause of job losses in the petroleum refining industry, or reduced access to affordable motor vehicles, is belied by the fact that EPA's GHG standards (which applied far more broadly than California's) were aligned with, or more stringent than, these ACC I GHG standards over the bulk of the period since 2012.  And even if Plaintiffs could allege injury to third parties caused by these California GHG standards, Plaintiffs still fail to allege facts that would support redressability—i.e., that automakers

---

[5] Nor can the proposed intervening party cure Plaintiffs' failure to plead standing.  *See* Opp. to AFPM Motion to Intervene, Dkt. 33 at 17 ("Intervention presupposes the pendency of an action in a court of competent jurisdiction and cannot create jurisdiction if none existed before.").

would decrease national average fuel-economy if GHG standards applicable in one State were rendered unenforceable, *and* that any such changes would be of such a scale as to support standing for the United States.

Plaintiffs have thus failed to establish that they have Article III standing to challenge the GHG standards of ACC I.  Plaintiffs' first cause of action should be dismissed without leave to amend.

### B.  Plaintiffs Cannot Establish Standing on the Basis of Hypothetical Future GHG Standards

For the reasons discussed in Section I.B above, Plaintiffs cannot establish standing through speculation about future standards, "like ACC III," that may or may not interfere with federal activities in the future.  FAC ¶¶ 91, 105–106.

## CONCLUSION

The first amended complaint should be dismissed.

Dated:  July 7, 2026                    Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ Caitlan McLoon*

CAITLAN MCLOON
Deputy Attorney General
*Attorneys for Defendants California Air Resources Board and Steven S. Cliff, in his capacity as the Executive Officer of the California Air Resources Board*

LA2026400455
68570548

25

**CERTIFICATE OF SERVICE**

Case Name:    **United States of America, et al. v. California Air Resources Board, et al.**

Case No.:    **2:26-cv-00847-DJC-SCR**

I hereby certify that on July 7, 2026, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on July 7, 2026, at Los Angeles, California.

| Beatriz Davalos | /s/ Beatriz Davalos |
|:---:|:---:|
| Declarant | Signature |

LA2026400455
68345863