# Exhibit A

Exhibit A to Defendants' Request for Judicial Notice

1

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
JOHN K. ADAMS
DAVID D. MITCHELL
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 353-5905
robert.stander@usdoj.gov
john.adams3@usdoj.gov
david.mitchell@usdoj.gov

ERIC GRANT
*United States Attorney*
501 I Street, Suite 10-100
Sacramento, California 95814
United States Department of Justice
(916) 554-2700

*Counsel for the United States*

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAIMLER TRUCK NORTH AMERICA LLC, INTERNATIONAL MOTORS, LLC, PACCAR INC, and VOLVO GROUP NORTH AMERICA LLC, <br><br> Plaintiffs, <br><br> THE UNITED STATES OF AMERICA, and UNITED STATES ENVIRONMENTAL PRO-TECTION AGENCY, <br><br> Plaintiffs-Intervenors, <br><br> v. <br><br> CALIFORNIA AIR RESOURCES BOARD and STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, <br><br> Defendants. | No. 2:25-cv-02255-DC-AC <br><br> **Declaration of Assistant Administrator Aaron Szabo in Support of the United States' Motion for Summary Judgment** <br><br> Date: August 7, 2026 <br> Time: 1:30 p.m. <br> Location: Courtroom 8, 13th Floor <br> Judge: Hon. Dena Coggins |

Declaration of Assistant Administrator Aaron Szabo                                              1

1.     I, AARON SZABO, pursuant to 28 U.S.C. § 1746, declare, under penalty of perjury, that the following facts are true and correct and based upon my personal knowledge or upon information provided to me by persons in my official capacity.

2.     I am over eighteen years of age. If called to testify in this matter, I can and will competently testify to the following facts.

3.     I am the Assistant Administrator for the United States Environmental Protection Agency ("EPA" or "the Agency") Office of Air and Radiation ("OAR"), which is located at 1200 Pennsylvania Avenue, NW, Washington, D.C. 20460.

4.     Prior to joining EPA, I served as a federal civil servant, first at the Nuclear Regulatory Commission, where I worked on nuclear power plant issues and regulations, and then at the White House Office of Information and Regulatory Affairs, where I worked on major climate and air regulations. I continued my career civil service as the Senior Counsel at the Council on Environmental Quality, where my role expanded to include the National Environmental Policy Act and federal sustainability issues. I hold degrees in economics, government and politics from the University of Maryland, College Park, and a law degree from George Washington University Law School.

5.     OAR is the EPA office with primary responsibility for administration of the Clean Air Act ("CAA"). As the Assistant Administrator for OAR, I serve as the principal advisor to the Administrator on matters pertaining to air and radiation programs and am responsible for managing these programs, including: policy development and evaluation; development of emissions standards; policy guidance and overview; and technical support and evaluation of regional air and radiation program activities.

6.     Through my role as Assistant Administrator for OAR, I am familiar with the development and implementation of EPA programs, policies, and regulations under the CAA. As part of my duties, I oversee the development and implementation of regulations, policy, and guidance under section CAA section 202 with respect to federal emission standards for new motor vehicles and new motor vehicle engines, 42 U.S.C. § 7521, and under CAA section 209 with respect to

Declaration of Assistant Administrator Aaron Szabo                                    2

preemption and waivers of preemption for new motor vehicle and new motor vehicle engine emission standards, 42 U.S.C. § 7543.

7. This declaration is filed in support of EPA's motion for summary judgment in *Daimler Truck North America LLC v. California Air Resources Board*, No. 2:25-cv-02255-DC-AC (E.D. Cal.).

8. Pursuant to Title II of the CAA, EPA develops and promulgates emission standards for new motor vehicles and new motor vehicle engines on a model-year by model-year basis. This regulatory structure reflects the practical reality that manufacturers develop, manufacture, market and sell vehicles on a yearly cycle.

9. It is public knowledge that manufacturers are currently selling model year 2026 vehicles and will transition to selling model year 2027 vehicles in the second half of the year. It is EPA's experience and understanding that in general, manufacturers make changes to existing vehicle models for new model years to improve performance, respond to consumer preferences, and compete in the marketplace. Manufacturers may also develop new models or retire existing models as of a particular model year. Manufacturers and suppliers also respond to compliance requirements, including emission standards, by developing and implementing emission control technologies for the applicable model year. *See, e.g.*, 89 Fed. Reg. 29440, 29561 (Apr. 22, 2024) ("manufacturers will make their own assessment of the vehicle market and their own decisions about which technologies to apply to which vehicles for any given model year").

10. Development of a given model year vehicle begins years in advance and varies based on the class of vehicle (i.e., light-, medium-, or heavy-duty) and applicable regulatory requirements that are coming into force for that model year (i.e., the degree of alteration required from prior model years to achieve compliance). During that time, manufacturers and suppliers expend substantial resources on research and development, testing, and production planning to enable production at scale in a timely and economically viable manner. *See, e.g.*, 75 Fed. Reg. 25324, 25332 (May 7, 2010); 77 Fed. Reg. 62624, 62840–84 (October 15, 2012). In general, the development, production, and marketing of new heavy-duty vehicles and engines require significant time

Declaration of Assistant Administrator Aaron Szabo                                    3

and resources given the relatively greater size, cost, and in-use expectations for such vehicles and engines, including those used in interstate shipping.

11.    By statute and as a matter of reasoned decisionmaking, EPA takes such "lead time" into account when developing, proposing, and finalizing emission standards under CAA section 202(a). For all classes of vehicles and engines, the effective date of emission standards must account for the time necessary to develop and apply the requisite technology, giving appropriate consideration to the cost of compliance within such period. 42 U.S.C. § 7521(a)(2). In general, such considerations are reflected in the model year selected for revised standards, with a later model year selected when more time is needed to develop and apply technologies in a cost-reasonable manner. For heavy-duty vehicles, standards can apply no earlier than four model years after promulgation, and must apply for at least three model years. 42 U.S.C. § 7521(a)(3)(C).

12.    Infrastructure can be a relevant factor for manufacturers in developing, producing, marketing and selling new vehicles and engines and for EPA in developing, proposing, and finalizing emission standards. For example, emission control technologies that require regular maintenance or the addition or replacement of fluids or component parts depend upon the availability and cost of the relevant goods and services throughout the nation and in individual regions. *See, e.g.*, 88 Fed. Reg. 4296, 4376 (Jan. 24, 2023). This is particularly the case for regulatory requirements that anticipate or mandate the production, marketing, and sale of electric vehicles, which require the availability of maintenance capacity capable of handling electric-vehicle specific maintenance and the availability of electric-vehicle charging stations capable of handling the class of vehicle at issue.

13.    Regulatory certainty is critical for EPA's administration of the Clean Air Act as manufacturers work towards complying with requirements going into effect in a future model year. Efforts undertaken to comply with standards going into effect in a future model year are generally not fungible, meaning they cannot easily be redirected toward compliance if the standards change to become more stringent or different in kind. This concern is heightened as to electric-vehicle requirements that require significant changes to many aspects of manufacturers' businesses and to the requisite supporting infrastructure.

Declaration of Assistant Administrator Aaron Szabo                    4

14.    The express preemption provision for new motor vehicle and new motor vehicle engine emission standards in CAA section 209(a) is critical to the Title II regulatory scheme and EPA's implementation of statutory requirements. In EPA's experience, given the structure and economics of the new motor vehicle and engine market, manufacturers and suppliers require regulatory certainty in advance to engage in the resource-intensive activities necessary to produce, and ultimately market, compliant vehicles for the model year at issue.

15.    Preemption safeguards EPA's ability to develop standards in a rational way by understanding the technical, economic, and practical factors impacting manufacturers' ability to comply and the degree to which standards can be expected to further public health and welfare without disrupting Americans' access to affordable transportation or products transported throughout the country every day by interstate trucks. Absent preemption, the possibility of multiple competing and potentially conflicting sets of standards disrupts EPA's ability to develop, propose, and promulgate standards that comply with relevant statutory requirements and achieve Congress' design for the national vehicle market.

16.    The preemption waiver provision in CAA section 209(b) authorizes a limited exception whereby California may request a waiver of preemption from EPA provided that it makes the required determination and EPA, in turn, after notice and opportunity for a public hearing, determines that none of the statutory factors barring a preemption waiver apply to the standards at issue. Compliance with the procedural and substantive requirements of CAA section 209(b) is essential to maintaining a workable system whereby EPA reviews the standards as part of evaluating the state's request.

17.    Thus, EPA assesses the state's determination that the standards will be, in the aggregate, as least as protective as federal standards, confirms that the standards are necessary in response to compelling and extraordinary conditions, and evaluates whether the standards are consistent with the requirements Congress set for emission standards in CAA section 202(a). Absent this process, the possibility of multiple competing and potentially conflicting standards disrupts EPA's ability to develop, propose, and promulgate standards that comply with relevant statutory requirements and achieve Congress' design for the national vehicle market.

Declaration of Assistant Administrator Aaron Szabo                                          5

18.    In addition, the procedural and substantive requirements of the preemption waiver provision in CAA section 209(b) promote regulatory certainty in a manner that furthers the federal interest in manufacturer compliance with applicable standards in an effective, timely, and reasonable manner. The issuance of a preemption waiver by EPA confirms that relevant manufacturers are subject to the California standards to which the waiver applies. Conversely, the absence of a preemption waiver from EPA confirms that manufacturers are not subject to the California standards at issue.

19.    In EPA's experience, regulatory uncertainty with respect to standards for future model years generally forces manufacturers to work toward compliance with the most stringent requirements among the possible standards, even when those efforts are inconsistent with federal standards that are currently in place for those model years, and even when the most stringent requirements among the possible standards are inconsistent with the requirements of the CAA.

20.    The California Air Resources Board ("CARB") withdrew all requests for preemption waivers pending before EPA as of January 2025 before the current presidential administration assumed office on January 20, 2025. Relevant here, CARB withdrew its waiver request for the "Advanced Clean Fleets" regulation, adopted in 2023 and codified at Cal. Code Regs. tit. 13, § 2016, on January 13, 2025. CARB has not resubmitted its waiver request for "Advanced Clean Fleets," and EPA has not issued a preemption waiver for that regulation.

21.    CARB has not submitted any requests for preemption waivers to EPA since the current presidential administration assumed office on January 20, 2025. Relevant here, CARB has not submitted a waiver request for the "Emergency Rule," adopted in 2025 and codified in titles 13 and 17 of the California Code of Regulations, and EPA has not issued a preemption waiver for that regulation.

22.    CARB has not submitted any requests for "within the scope" determinations since the current presidential administration assumed office on January 20, 2025. Relevant here, CARB has not submitted a request for a "within the scope" determination for the "Emergency Rule," and EPA has not issued a "within the scope" determination for that regulation.

Declaration of Assistant Administrator Aaron Szabo                                    6

Executed on April 20, 2026

_____
Aaron Szabo
Assistant Administrator,
Office of Air and Radiation
U.S. Environmental Protection Agency

Declaration of Assistant Administrator Aaron Szabo                              7